639 F.2d 82
 Irving M. ROSEN, Trustee in Reorganization of Bermec
Corporation, Plaintiff- Appellee,
v.
Lynda DICK, Executrix of the Estate of Jack R. Dick,
Deceased, Herman L. Meckler, Herbert R. Degnan, John Doe I
and John Doe II as Executors or Administrators of the Estate
of Bernard Kaye and Audrey Kaye, Deceased, Robert D. Byrnes,
Jerome S. Katzin, Hal A. Kroeger, Thibaut deSaint Phalle,
Charles H. Harff, Chadbourne, Parke, Whiteside & Wolff,
Joseph Bonura, Peat, Marwick, Mitchell & Co., Arthur
Andersen & Co. and Empire National Bank, Defendants.
ARTHUR ANDERSEN & CO., Defendant and Third-Party Plaintiff-Appellant,
v.
ARISTOCRAT ANGUS RANCH, Ben R. Houston, and Charles D.
Alexander, Third-Party Defendants.
 No. 3, Docket 79-7844.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 24, 1980.
Decided Dec. 30, 1980.
Rehearing Denied Feb. 10, 1981.
 
 1
 Richard I. Donner, New York City (Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, Martin S. Siegel and Kenneth S. Dannett, New York City, of counsel), for plaintiff-appellee.
 
 
 2
 Peter Fleming Jr., New York City (Curtis, Mallet-Prevost, Colt & Mosle, New York City, John E. Sprizzo and Mark D. Speed, New York City, and Wilson & McIlvaine, Chicago, Ill., Charles W. Boand, Chicago, Ill., of counsel), for defendant and third-party plaintiff-appellant.
 
 
 3
 Before MOORE, KEARSE, Circuit Judges, and TENNEY, District Judge.*
 
 TENNEY, Senior District Judge:
 
 4
 This interlocutory appeal under 28 U.S.C. § 1292(b) represents one small part of the complex bankruptcy reorganization of Bermec Corporation ("Bermec"). In May 1973, Bermec's Trustee in Reorganization ("Trustee") brought this plenary action centering on Bermec's acquisition of Black Watch Farms ("Black Watch"), a cattle tax shelter.[1] The principal problem raised here, as the case heads for trial, is the extent to which one defendant, who has not demanded a jury trial, may rely on another's jury demand. We modify the district court's order and remand for trial in accordance with this opinion.
 
 BACKGROUND
 
 5
 Factual History. In the spring of 1968, Bermec began negotiations to buy Black Watch. Trustee's Second Amended Complaint ("Complaint") P 22, Joint Appendix ("Appendix") at 62; Answer of Defendants Meckler and Degnan to the Complaint ("Meckler's Answer")[2] P 17, Appendix at 168; Answer of Arthur Andersen & Co. to the Complaint ("Andersen's Answer") P 22, Appendix at 112. Pursuant to a letter dated May 27, 1968, Arthur Andersen & Co. ("Andersen"), a public accounting firm, conducted a limited investigation of certain balance sheet accounts of Black Watch as of March 31, 1968. On June 14, Andersen delivered to Bermec a letter and report on its findings. On June 21, Bermec entered into a purchase agreement for a large portion of the ownership interests in Black Watch. On July 11, the agreement was executed by exchanging the farm's assets for a substantial amount of Bermec stock. Complaint PP 22-23, 163, Appendix at 62, 94-95; Meckler's Answer PP 17-18, Appendix at 168; Andersen's Answer PP 22-23, 162-63, Appendix at 112, 119-20.
 
 
 6
 In the fall of 1968, Andersen examined the consolidated financial statements of Bermec for the twelve-month period ending June 30, 1968. The records examined included the financial statements of the Black Watch partnership before Bermec's purchase. In a certification dated September 11, 1968, Andersen stated:
 
 
 7
 In our opinion, the financial statements (of Black Watch Farms) present fairly the financial position of (the farms) as of June 30, 1968, and the results of its operations for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the year ended December 31, 1967.
 
 
 8
 Complaint PP 178-79, Appendix at 97-98; Andersen's Answer PP 178-79, Appendix at 121. (Meckler's Answer did not address these paragraphs on the grounds that they "contain no allegations to which a responsive pleading is required by Meckler or Degnan." Meckler's Answer P 77, Appendix at 178.)
 
 
 9
 In December 1968 and January 1969, Bermec acquired the outstanding Black Watch interests which were not covered by the first transaction. In addition, between July 1968 and September 1970, Bermec allegedly extended credit to Black Watch, performed some unspecified services for the farm, and made cash advances. Although the particulars of these transactions are in dispute, both Meckler and Andersen have admitted that Bermec's affairs with Black Watch extended beyond the two purchases. Complaint PP 26-27, Appendix at 63; Meckler's Answer PP 21-22, Appendix at 168-69, Andersen's Answer PP 26-27, Appendix at 112. In September 1970 Black Watch filed a petition under Chapter XI of the Bankruptcy Act and was adjudicated bankrupt on April 30, 1971, as a result of which Bermec suffered substantial injury.
 
 
 10
 At some point in the history of these business affairs a date which is crucial to the defendants' liabilities, if any the corporate directors, accountants, and commercial lenders of Bermec discovered that Black Watch was not worth what Bermec had paid, that money had been wrongfully withdrawn from the farm through a series of improper transactions (the "defalcations"), and that the owners of Black Watch had misrepresented its financial condition in selling their interests to Bermec (the "misrepresentations").[3] Complaint PP 31-40, Appendix at 63-67. The defendants have denied knowledge or information sufficient to judge the truth of the Trustee's allegations about Black Watch's financial background, but they admit on information and belief that the defalcations and misrepresentations did occur. Meckler's Answer PP 26-35, Appendix at 169-72; Andersen's Answer PP 31-40, Appendix at 113-15.
 
 
 11
 Procedural History. In his original complaint, the Trustee alleged several violations of the federal securities laws and breaches of common law duties owed to the corporation. The named defendants were officers and directors of Bermec, including Herman Meckler, the former chairman and chief executive officer; as well as Empire National Bank; Peat, Marwick, Mitchell & Co., a public accounting firm which acted as Black Watch's independent auditor prior to its acquisition by Bermec; and Jack Dick, described as the "moving force" behind Black Watch at the time of Bermec's purchase.[4] Appellant's Brief at 3; Complaint PP 3-12, Appendix at 3-4. The Trustee's claims against the corporate directors sounded in fraud and failure to exercise proper care in purchasing Black Watch. He alleged that prior to Bermec's second purchase from Black Watch, the corporate directors learned of Dick's defalcations, but they failed to investigate them properly or to reveal them to the corporation, as a result of which Bermec continued to sink more and more money into a losing venture. Original Complaint PP 48-58, Appendix at 12-14.
 
 
 12
 In September 1973, Meckler answered the complaint, asserted several cross-claims, and made a general jury demand. In November of that year, the Trustee served an amended complaint which particularized his allegations, but which is otherwise immaterial to this appeal. Then in March 1974, plaintiff Trustee was granted leave to file his second amended complaint, adding several defendants, including appellant Andersen, another public accounting firm. Andersen was charged with breaching its professional duties in connection with its investigation and financial reports on Black Watch, Complaint PP 160-70, Appendix at 94-96, and plaintiff further alleged that Andersen aided and abetted the corporate defendants' wrongdoing, Complaint PP 193-99, Appendix at 101-02. Andersen denied any grounds for liability; asserted various cross-claims, including claims against Meckler and the other corporate defendants; and filed a third-party complaint against several other persons and entities involved in the Black Watch transactions. Appendix at 110-54. After Andersen filed its answer and cross-claims, Meckler responded to the Complaint, answered Andersen's cross-claims, and asserted its own cross-claims against Andersen. Appendix at 164-84. The cross-claims between Andersen and Meckler seek contribution and indemnification for any liability suffered under the federal securities law or under the common law. Andersen's Answer PP 287-88, Appendix at 141; Meckler's Answer PP 89-91, Appendix at 180-81.
 
 
 13
 In his answer to the original complaint, Meckler demanded a jury trial. In December 1978, the plaintiff Trustee moved to strike the jury demand in its entirety on the ground that the Seventh Amendment does not extend to the matters raised, and in the alternative, he moved for a separate trial of the Trustee's claim against Andersen on the ground that Meckler's jury demand did not cover the issues surrounding Andersen's liability.[5] Appendix at 185. In an opinion dated June 26, 1979, Judge Metzner refused to strike the jury demand in its entirety, but ordered that "(t)he issues between plaintiff (Trustee) and Andersen will be tried to the court without a jury, and that trial shall proceed before any other claims are tried." 83 F.R.D. 540, 544 (S.D.N.Y.1979). Judge Metzner's decision rested on alternative grounds. First, he found that Meckler's jury demand did not "embrace" the issues presented by the claims against Andersen. Second, he stated that he "would have stricken an otherwise proper jury demand covering all parties under the developing theory that such claims are not protected by the Seventh Amendment to the Constitution." Id. at 543. On a motion for reargument, Judge Metzner denied Andersen's request, but certified for interlocutory appeal the following questions which are now before this panel:
 
 
 14
 (1) Is defendant Arthur Andersen & Co. entitled to a trial by jury of the issues between plaintiff and itself based on the jury demand filed by defendant Meckler?
 
 
 15
 (2) If it is so entitled, is the opinion of this court correct that nevertheless a jury trial in this case is not protected by the Seventh Amendment to the Constitution?
 
 
 16
 (3) Should the court recuse itself under the circumstances of this case?
 
 
 17
 83 F.R.D. at 546-47.
 
 
 18
 Upon careful consideration of these questions, we have found that Andersen waived whatever jury trial rights it could have asserted in this case, except to the limited extent of the issues "embraced" by Meckler's jury demand. As to the issues embraced by Meckler's jury demand, we note that Judge Metzner refused to invoke the limits of the Seventh Amendment to strike the existing jury demand, thereby implicitly ruling that these issues are not too complex for a jury to decide. We therefore need not confront the divisive and perplexing problem of a district court's discretion to take complex cases away from the jurors who would otherwise hear them. Compare In re United States Financial Sec. Antitrust Litigation, 609 F.2d 411 (9th Cir. 1979), cert. denied sub nom. Gant v. Union Bank, 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980), with Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 631 F.2d 1069, 29 Fed.Rules Serv.2d 933, 49 U.S.L.W. 2051 (3d Cir. July 22, 1980). We would, however, question Judge Metzner's endorsement of what he calls the "developing theory" about the limits of the constitutional jury trial right. Without some direction from the Supreme Court and without fuller consideration of the problem by this court, it would be premature to suggest that one view of this matter has prevailed over the other in this Circuit.
 
 MECKLER'S DEMAND UNDER RULE 38
 
 19
 The record in this case is peppered with equivocal statements made by the parties and the Judge about how the case would eventually be tried. These references have provided the parties with fertile ground for arguing over their understandings (and misunderstandings) about whether their factual disputes would be resolved by a court or a jury.[6] We decline, however, to launch immediately into a discussion of the nuances latent in the conferences and correspondence of this case. These gleanings are pertinent, but not central to our inquiries. Instead, we begin with the jury trial rule itself, Federal Rule of Civil Procedure ("Rule") 38, which provides in part:
 
 
 20
 (a) Right Preserved. The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.
 
 
 21
 (b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party.
 
 
 22
 (c) Same: Specification of Issues. In his demand a party may specify the issues which he wishes so tried; otherwise he shall be deemed to have demanded trial by jury for all the issues so triable. If he has demanded trial by jury for only some of the issues, any other party within 10 days after service of the demand or such lesser time as the court may order, may serve a demand for trial by jury of any other or all of the issues of fact in the action.
 
 
 23
 (d) Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.
 
 
 24
 Undoubtedly, Rule 38 embodies the equitable principles of reasonable reliance (for a party seeking to invoke the jury trial right) and adequate notice (for the other parties in an action), and these principles allow the federal courts some latitude in enforcing the Rule so as to satisfy justifiable expectations while avoiding undue surprise. See, e. g., State Mut. Life Ins. Co. v. Arthur Andersen & Co., 581 F.2d 1045, 1050 (2d Cir. 1978).[7] But we must not lose sight of the Rule's basic character as a simple procedure for determining the exercise or waiver of the jury trial right. When applying the Rule and inquiring into reliance and notice, a court should start by measuring the parties' overt acts and their significance under the literal terms of the Rule. For a party probably cannot demonstrate the reasonableness of his or her reliance if the Rule has not been followed, nor can an opponent of a jury trial challenge the adequacy of notice if the Rule has been complied with.
 
 
 25
 Throughout the lengthy history of this litigation, there has been only one demand for a jury, the demand indorsed on the front of Meckler's answer to the original complaint. No other party neither the plaintiff Trustee nor any of the defendants has made any similar demand, and Meckler has never repeated the demand in his subsequent pleadings which answered the Trustee's amended complaints and which asserted and responded to cross-claims. Any right to a jury trial, therefore, hinges on Meckler's original demand.
 
 
 26
 At the outset, we must confront the Trustee's arguments that Meckler waived his jury trial right because the docket sheet was never marked to indicate a jury trial and because he served his original answer bearing the jury demand on the plaintiff alone. Appellee's Brief at 3, 5. Rule 38(d) provides that "(t) he failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury." Rule 5(d) states that "(a)ll papers ... required to be served upon a party shall be filed with the court either before service or within a reasonable time thereafter." Fed.R.Civ.P. 5(d). The affidavit of service indicates that Meckler's answer was served on the Trustee on September 24, 1973, Appendix at 38, and the answer bears the stamp "FILED," dated September 25, 1973. Surely, the one-day delay satisfies the reasonable time requirement. The fact that the docket sheet was never marked for a jury trial represents an unfortunate oversight by the clerk's office, but it is not enough of a defect to enforce a waiver against a party who has otherwise complied with Rule 38. Meckler's answer bore on its face a clear indorsement, in bold letters, demanding a jury trial. This format is the one suggested by Professor Moore "since it gives better notice, particularly to the clerk." 5 Moore's Federal Practice P 38.40, at 38-362 (2d ed. 1980). Once a party has given the clerk clear notice of a jury demand, it is the clerk's obligation to mark the court's records appropriately. Fed.R.Civ.P. 39(a) ("When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action."); Fed.R.Civ.P. 79(a) ("When in an action trial by jury has been properly demanded or ordered the clerk shall enter the word 'jury' on the folio assigned to that action."). Improper or incomplete notations on the docket sheet, which is under the court clerk's exclusive control, will not constitute a waiver for failure to file, so long as the party complies with the terms of Rule 5(d).[8] Whitman Elec. Inc. v. Local 363, IBEW, 398 F.Supp. 1218, 1223 (S.D.N.Y.1974).
 
 
 27
 Regarding service of the demand, Rule 38(b) says that a written demand must be served "upon the other parties." Professor Moore, without the benefit of case authority, interprets this phrase to mean "upon all other parties to the action not joining in the demand." 5 Moore's, supra, P 38.40, at 38-364.[9] The record in this case shows only one affidavit of service of Meckler's answer, Appendix at 38, and Andersen has never suggested that any other parties were served with it. In his opinion below, Judge Metzner noted that the demand "was served only on the plaintiff," 83 F.R.D. at 542, but in ruling that Andersen could rely on Meckler's indorsement " 'to the extent of the issues embraced by that demand,' " id., he implied that the minimal service did not foreclose the demand's effectiveness. Upon our own consideration of this question, we concur in Judge Metzner's implicit holding.
 
 
 28
 The service of a jury demand on the other parties in a case is central to the operation of Rule 38. If a demand is never communicated, surely a party cannot rely on his or her unexpressed intentions or hopes. But even when a jury demand has been served on less than all interested parties, a court may still inquire whether the demand, effective as to the party served, should be considered effective as to the unserved parties. For example, in DeGioia v. United States Lines Co., 304 F.2d 421 (2d Cir. 1962), this court held that a third-party defendant, who was not served with another third-party defendant's jury demand, nonetheless could, in fairness, be bound by it. Under the "special circumstances of this case," the objecting party was found to have had adequate notice of the demand and to have acquiesced in it. id. at 425.
 
 
 29
 Given the facts under consideration, this case is easier to resolve than DeGioia. We find the requirement of service and its equitable corollary of adequate notice to be satisfied, even without inquiring into "special circumstances of this case." If Andersen, who was never served with Meckler's demand, had opposed a jury trial, we might be forced to assess the fairness in this situation of ordering a jury trial over its objections. But far from objecting, Andersen seeks to rely on Meckler's demand which is how this interlocutory appeal arose. By contrast, the Trustee concedes that he was served with the demand, and he therefore should not be heard now to complain of inadequate notice.[10]
 
 
 30
 Furthermore, the record's numerous references to a jury, which references are equivocal at best, cannot be taken as an implied waiver or withdrawal of the existing demand. As this court commented in DeGioia :
 
 
 31
 While (the third-party defendant's) failure explicitly to urge its original demand in the subsequent proceedings added to the confusion surrounding the issue of jury trial, it cannot be considered a waiver of this "vital and cherished right." City of Morgantown v. Royal Ins. Co., 337 U.S. 254, 258, 69 S.Ct. 1067, 1069, 93 L.Ed. 1347 (1949).
 
 
 32
 304 F.2d at 424 n.1. Retraction of a jury demand is governed by Rules 38(d) and 39(a). Rule 38(d) states that "(a) demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties." To similar effect, Rule 39(a) provides, in pertinent part:
 
 
 33
 The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury...
 
 
 34
 None of the procedures, safeguards against inadvertent retraction of the jury demand, has been followed.[11] Meckler's demand, therefore, remains effective as to the Trustee who was served with it and as to Andersen's permissible limited reliance on it.
 
 
 35
 Before discussing Andersen's justifiable reliance, however, we must assess the breadth of the original demand. Because Meckler did not "specify the issues which he wishes so tried," Rule 38(c), "he shall be deemed to have demanded a trial by jury for all the issues so triable," id. Appellant Andersen quotes from the second sentence of 38(c) and argues that "a general jury demand, timely made by any party, secures to all parties the right to a jury trial of 'all the issues of fact in the action,' " regardless of Meckler's connection to those issues. Appellant's Brief at 14 (emphasis supplied by appellant). We decline, however, to interpret 38(c) so broadly. The phrases, "all the issues so triable" and "all of the issues of fact in the action," must be read in light of the Rule's general structure. Rule 38 preserves the Seventh Amendment's guarantee of a jury trial "(i)n Suits at common law," U.S.Const. Amend. VII. Rule 38(a); Shore v. Parklane Hosiery Co., 565 F.2d 815, 819 (2d Cir. 1977), aff'd on other grounds, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); 5 Moore's, supra, P 38.07(1), at 38-33. Subsection (b)'s language about issues "triable of right by a jury" (emphasis supplied) clearly refers to its narrow scope carried over from the Seventh Amendment's limitations. Similarly, subsection (c) should be read as incorporating the same restriction. Where Rule 38(c) speaks of "all the issues so triable," it means all the issues covered by the Seventh Amendment (or by statute, see Rule 38(a)) and for which a jury trial has been demanded. It does not mean that any jury demand ensures a jury trial for every issue regardless of the demander's connection with it.
 
 
 36
 The first sentence of subsection (c) gives each party discretion to demand a jury as to some or all of the issues affecting that party, and the second sentence allows other parties to assert the jury right as to any issues, with which they are connected, which were excluded from the initial demand. When Meckler made his general jury demand, he did so as to any and all issues between himself and the Trustee, on whom the demand was served. In accordance with accepted practice, this demand was effective as to any issues reiterated or raised anew between Meckler and the Trustee in any subsequent pleadings. Jackson v. Airways Parking Co., 297 F.Supp. 1366, 1383 (N.D.Ga.1969); 5 Moore's supra, P 38.41, at 38-364. The general jury demand extends to the issues covered in subsequent pleadings because the demander has already told his opponent that he wants a jury trial to the extent guaranteed by the Seventh Amendment. But this principle does not allow a party to demand a jury trial on issues raised later with which he is unconnected, nor on issues as to which he could not have demanded a jury trial in the first place. In Meckler's case, therefore, a jury trial has been demanded as to the existence of the alleged fraud in Black Watch's management, as to Dick's defalcations, and as to any breaches of the corporate directors' duties with respect to Bermec's two purchases from Black Watch. But Meckler did not demand a jury trial as to claims between himself and Andersen or between Andersen and the Trustee.[12]
 
 ANDERSEN'S RELIANCE ON MECKLER'S DEMAND
 
 37
 Reliance Generally. Rule 38(d), which says that a jury demand "may not be withdrawn without the consent of the parties," ensures that one party may rely on another's jury demand. State Mut. Life Ins. Co. v. Arthur Andersen & Co., supra, 581 F.2d at 1050. In addition, a review of the cases shows that the courts will not require the formal making of a superfluous second demand, nor will they penalize a party who has reasonably relied on an existing demand. See 5 Moore's, supra, P 38.45. But this principle, as well as the terms of Rule 38(d), are limited to those instances when a party may reasonably rely on another's demand and when a second demand would, in fact, be superfluous. If the first demand does not cover issues pertinent to a second party, the second party cannot rely reasonably on the first demand, and the second demand would be far from superfluous since, without it, the right to a jury trial will have been waived as to those additional issues. Similarly, although 38(d) gives each party an effective veto over the withdrawal of a jury demand, consent is only required to the extent that a particular party would have been entitled to rely on the demand that is, to the extent that the first demand covered the party's jury issues. If a litigant has already waived the jury trial right as to certain issues, he or she will not be relieved of that waiver by withholding consent to the withdrawal of a jury demand as to issues with which he or she is not connected.
 
 
 38
 As Professor Moore explains: "If one party has made a general demand ..., then the other parties may rely upon (it)." 5 Moore's, supra, P 38.40, at 38-361. But this reliance is limited to "all other parties in the action who are affected by the demand," id. P 38.45, at 38-391 (emphasis supplied), and the demand itself is effective only as to "all the issues that concern the demanding party .... (N)o other demand need be made by any party as to those issues," id. P 38.40, at 38-361 (emphasis supplied). Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 690 (9th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); Goldman, Sachs & Co. v. Edelstein, 494 F.2d 76, 77-78 (2d Cir. 1974); McKnight v. Dyer, 58 F.R.D. 191, 192 (N.D.Miss.1973); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2318 at 85 (1971 & 1979 Supp.).
 
 
 39
 In elaborating on these principles, Professor Moore offers an enlightening illustration:
 
 
 40
 (I)f the demand does not pertain to certain issues then one of the parties concerned with those issues should make demand therefor. Thus assume that A sues X; X answers and also files a third-party complaint against Y. If A makes a timely general demand the demand embraces all the issues between A and X, and X may rely thereon and need not make a demand for those issues. It is rather strained, however, to say that A 's general demand embraces the third-party issues between X and Y, with which A is not concerned. And it would seem that either X or Y should make a timely demand as to the third-party issues if a jury trial is desired as to those issues. If we vary the facts and assume that A has made no demand, but that X makes a general demand at the time he serves both his answer on A and the third-party complant on Y, then it should follow that X has demanded jury trial for the issues between him and A and between him and Y, and that both A and Y may rely thereon and need make no demand.
 
 
 41
 5 Moore's, supra, P 38.45, at 38-391 to 38-392 n.2 (emphasis supplied). In the quoted passage, the plaintiff's general demand did not reach the third-party issues "with which A is not concerned." See, e. g., Banks v. Hanover S.S. Corp., 43 F.R.D. 374, 379 (D.Md.1967) (plaintiff's general demand did not reach defendant's third-party complaint; jury trial granted, however, pursuant to the court's discretion under Rule 39(b) in the interest of the "efficient administration of justice"); McAndrews v. United States Lines Co., 167 F.Supp. 41 (S.D.N.Y.1958). In this case, the defendant Meckler made the general jury demand we are interpreting. He is surely "concerned" with the third-party issues which have arisen, but those issues were not part of the case at the time he demanded a jury trial, and he cannot rely on a demand made only to the plaintiff to cover the claims between himself and Andersen, even though he can rely on it to cover amendments between himself and the plaintiff.
 
 
 42
 Despite Andersen's eagerness to overlook any technical deficiency in Meckler's demand, neither of them can convert an inadequate demand into one that complies with Rule 38 by merely consenting to it. As urged by Professor Moore in the second half of his footnote, Meckler should have made his demand "at the time he serve(d) both his answer ... and the third-party complaint" if he had intended the demand to reach the issue of Andersen's liability. This case falls in between the two situations described in the quoted paragraph with the defendant, not the plaintiff, making a general jury demand, but making it before any third-party practice had begun. Upon considering these circumstances, we hold that whereas Meckler's demand categorically covers all the issues between himself and the Trustee, whether raised by the original or the amended pleadings, neither Meckler nor Andersen can consider the existing demand to categorically cover their cross-claims or the Trustee's claims against Andersen. On the other hand, when we pick apart the issues involving Andersen, we may find that Meckler's demand adequately invoked a jury trial as to some of them, and to this we now turn.
 
 
 43
 Limited Scope of Reliance. The Third Circuit has succinctly expressed the applicable standard as follows: "(A) defendant can rely on the jury demand of a co-defendant to the extent of the issues embraced by that demand." Collins v. Government of Virgin Islands, 366 F.2d 279, 284 (3d Cir. 1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967).[13] In Collins, the Third Circuit held that
 
 
 44
 where co-defendants are sued on the theory that they are jointly and severally liable for the same injury arising out of a single occurrence, a request by one for a jury trial on the issues of negligence and contributory negligence enures to the benefits of the other as well.
 
 
 45
 Id. at 285 (footnote omitted). Andersen attempts to portray its circumstances as identical to those in Collins, thereby warranting identical treatment.[14] For further support, Andersen quotes from the Trustee's counsel's statements that Andersen's liability arises from "the same occurrences and series of transactions" as the liability of the original defendants, that "the evidence needed to establish" Andersen's liability "will in great part be the same as that which will" prove the corporate defendants' liability, and that all of the Trustee's claims should be "pursued and decided in a single litigation." Affidavit in Support of Amending Complaint PP 31, 38, Appendix at 53, 55.[15] Although these arguments are pertinent to our ultimate resolution of this case, they do not, by themselves, dispose of the questions on appeal.
 
 
 46
 In deciding which of Andersen's issues are "embraced" by Meckler's demand, the court has drawn on analogous cases where a litigant who has already waived the right to a jury may nonetheless demand a jury trial as to "new issues" raised by subsequent pleadings. If new issues are raised, they are not covered by an initial waiver because the waiving party has never had an opportunity to consider whether he wants a jury trial as to issues which were not previously part of the case. But if the purportedly new issues are simply artful rephrasings of existing issues, the original waiver will be enforced, for the party has already considered and forfeited his right to a jury. By the same token, if Andersen's issues are "embraced" by Meckler's demand, Andersen can rely on its codefendant's demand; otherwise not. In both situations, the preliminary inquiry is the same: What is an issue, and when is one issue different from another?
 
 
 47
 First, we stress that the term "issue" means something more than the evidence offered and the legal theories pursued, although these are pertinent factors. In Cataldo v. E.I. du Pont de Nemours & Co., 39 F.R.D. 305, 308 (S.D.N.Y.1966), the court asked whether, "(d)espite the fact that the underlying evidentiary facts are arguably substantially similar, the ultimate issue for decision is different." Furthermore, as explained by the Ninth Circuit, "the presentation of a new theory (of recovery) does not constitute the presentation of a new issue on which a jury trial should be granted." Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1050 (9th Cir. 1974) (emphasis in original); see Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 620 (9th Cir. 1979), cert. denied, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); Guajardo v. Estelle, 580 F.2d 748, 752-53 (5th Cir. 1978). A legal theory incorporates issues of law which do not concern the jury, whereas only factual questions raise the possibility of a jury trial. Shore v. Parklane Hosiery Co., supra, 565 F.2d at 819. In addition, the word "issue" in Rule 38 must be read together with its other uses in the Federal Rules of Civil Procedure. For example, regarding summary judgment, Rule 56 asks whether there is any "genuine issue as to any material fact," Fed.R.Civ.P. 56(c). This standard clearly refers to the disputed conclusions which can be drawn from the evidence uncovered during discovery. It does not refer to purely legal questions or to the evidence itself. Similarly, Rule 38 suggests that the jury trial right extends only to disputed factual conclusions. By extending the time period for demanding a jury trial until "10 days after the service of the last pleading directed to such issue," Rule 38(b) thereby allows a party to wait for a responsive pleading which shows whether an issue of fact exists before making the jury demand. Trixler Brokerage Co. v. Ralston Purina Co., supra, 505 F.2d at 1050.
 
 
 48
 Turning to specifics, many cases posing the question of "new issues" involved only minor changes in the pleadings which the parties argued should relieve them of a prior waiver. These cases suggest that litigants may try to remedy their inadvertence or to satisfy a change of heart by making insubstantial alterations in their papers. E. g., State Mut. Life Ins. Co. v. Arthur Andersen & Co., supra, 581 F.2d at 1049 (merely adding codefendants); Walton v. Eaton Corp., 563 F.2d 66 (3d Cir. 1977) (en banc) (federal statutory claim for racial discrimination in employment amended to allege mental and emotional injury); Connecticut Gen. Life Ins. Co. v. Breslin, 332 F.2d 928, 931 (5th Cir. 1964) (amended answer merely changed a denial to an affirmative allegation of an alternative fact); Jackson v. Airways Parking Co., 297 F.Supp. 1366, 1383-84 (N.D.Ga.1969) (amendment added claim of willfulness in violating a statute already invoked in the action); Leighton v. New York Susquehanna & W. R.R. Co., 36 F.R.D. 248, 249 (S.D.N.Y.1964) (Weinfeld, J.) ("An amendment which merely alters the character of the relief sought here from a defense on a contract to a demand for repayment of moneys paid thereunder does not revive the right to a trial by jury." (footnote omitted)); Ridge Theatre Corp. v. United Artists Corp., 27 F.R.D. 8, 10 (E.D.Pa.1961) (amendment correcting the description of one defendant out of eight already joined in the suit); E. H. Tate Co. v. Jiffy Enterprises, Inc., 16 F.R.D. 571, 574 (E.D.Pa.1954) (changing relief sought); Reeves v. Pennsylvania R.R. Co., 9 F.R.D. 487, 488 (D.Del.1949) (merely giving greater detail to allegations of negligence).
 
 
 49
 Other cases, however, have forced the courts to examine more closely what issues have already been raised in order to decide whether a new issue is presented. In this Circuit, the most recent discussion of this problem appears in Lanza v. Drexel, 479 F.2d 1277 (2d Cir. 1973) (en banc). There, one of the defendants asserted a right to demand a jury trial in response to the plaintiffs' amended securities complaint which added a charge under an analogous statute, a claim for punitive damages, and an allegation of willfulness. The court rejected the defendant's argument with the following language:
 
 
 50
 The amendments did not raise new issues within the meaning of Rule 38 such as would entitle Kircher to demand a jury trial as of right. The case involved, and the original complaint raised, one basic issue: Whether plaintiffs were fraudulently induced to exchange their Victor stock. Kircher's failure to demand a jury trial waived his right as to all issues relating to this general area of dispute. The amendment added no new issues: the same conduct and the same allegedly false documents constituted the basis for any claim under Rule 10b-5, Section 17(a), or common law fraud. The willfulness and falsity as of a particular date merely clarified "the same general issues" raised in the original complaint. Moore v. United States, 196 F.2d 906, 908 (5th Cir. 1952). Kircher had been put on notice of the underlying facts and basic legal theory fraud upon which plaintiffs sought relief, and the character of the suit was in no way changed by the amendments.
 
 
 51
 Id. at 1310. Other circuit courts have either expressly followed the reasoning in Lanza or adopted a similar approach. E. g., Las Vegas Sun, Inc. v. Summa Corp., supra; Walton v. Eaton Corp., supra, 563 F.2d at 71-74; First Wis. Nat'l Bank v. Klapmeier, 526 F.2d 77 (8th Cir. 1975); Hostrop v. Board of Jr. College Dist. No. 515, 523 F.2d 569 (7th Cir. 1975), cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); Trixler Brokerage Co. v. Ralston Purina Co., supra.
 
 
 52
 Although the courts' decisions in these cases turned on a careful weighing of the particular pleadings and claims presented, a brief review of the circumstances involved offers some helpful lessons about how to interpret Meckler's jury demand. In the two Ninth Circuit cases, the plaintiffs invoked additional legal principles, as in Lanza, but added no new factual issues to their cases. In Las Vegas Sun, supra, 610 F.2d at 620, a complaint alleging conspiracy in restraint of trade under the Sherman Act, 15 U.S.C. § 1, was amended to include claims under the Clayton Act, 15 U.S.C. § 19, and under Nevada common law. But the court refused to grant a jury trial, ruling that all the issues "turn on the same matrix of facts.... (T)he factual allegations underlying all of its claims are that the charged corporations and individuals conspired to terminate their advertising accounts with the Sun for an anticompetitive purpose." Id. In Trixler, the plaintiff-broker charged the defendant-manufacturer with breach of contract, bad faith, misrepresentation and antitrust violations in connection with the manufacturer's change to direct sales. After waiving a jury trial on its original five claims, the plaintiff amended the complaint to add its "sixth and seventh claims, ... elaborating on the charges of bad faith in the fifth claim(. But, the court ruled, this) did not create new issues. By any reasonable analysis, the identical issue of bad faith is charged in each one of the claims." 505 F.2d at 1050 (emphasis in original).
 
 
 53
 In Hostrop and Klapmeier, the claims added by amendment presented much more difficult questions. In Hostrop, the plaintiff, the former president of a public junior college, alleged that he had fulfilled his contractual obligations and that his termination violated his rights under the Due Process Clause. 523 F.2d at 581. On the eve of trial, he amended his complaint to assert a claim for contract damages and to demand a jury trial. Although finding "the matter ... not free from doubt," id., the court denied the plaintiff a jury trial on the grounds that his amendment raised no new issue since he could have been awarded contract damages for any proven constitutional claims. In Klapmeier, the plaintiff-bank sued several corporate stockholders who had guaranteed the corporation's indebtedness. The defendants counterclaimed for defamation, but neglected to demand a jury trial. In an amended answer, the defendants added a claim of fraud in the inducement in agreeing to the guarantee. Because this claim "substantially differed from their prior pleading," 526 F.2d at 80, the court granted a jury trial limited to the issue of fraud.
 
 
 54
 To similar effect, older cases, decided before Lanza, presaged the newer authorities discussed. E. g., Christenson v. Diversified Builders Inc., 331 F.2d 992 (10th Cir.), cert. denied, 379 U.S. 843, 85 S.Ct. 82, 13 L.Ed.2d 48 (1964); Transocean Air Lines v. Pan American World Airways, Inc., 36 F.R.D. 43 (S.D.N.Y.1964). In Christenson, on January 5, 1962, the defendant asserted a counterclaim based on the contract the plaintiff sought to enforce. At the same time, the defendant filed a third-party complaint against the contract's surety. On January 23, the plaintiff replied, and on February 6, the surety answered. The court held that the defendant's jury demand filed on February 9 would be effective only as to the surety claim, which was a separable issue from the underlying contract claims. In Transocean Air Lines, the plaintiffs alleged antitrust violations by their suppliers, who counterclaimed on the basis of unpaid promissory notes. Plaintiffs' jury demand, timely only as to the counterclaim, was not precluded by their prior waiver of a jury trial on the antitrust claims.
 
 
 55
 From these precedents, several principles emerge. Although the term "issue" is not the same as the evidence offered or the legal theories advanced, the evidence and theories involved are nonetheless relevant to our determination. Lanza, supra, 479 F.2d at 1310. Even though Rule 38 directs us to decide ultimately what "issues" are covered by Meckler's demand, Lanza's phrase, "the same general issues," is broad enough to encompass "the basic legal theory" and "the character of the suit." Id. On the other hand, when the parties are the same before and after an amended pleading, it is difficult to show that a new issue has been raised. Usually, the initial jury demand (or waiver) will put the other parties on notice that a jury (or the court) will be trying "all issues relating to (the) general area of dispute." Lanza, supra, 479 F.2d at 1310. Thus, the issues of fraud in Lanza, bad faith in Trixler, and conspiracy in Las Vegas Sun were not changed by amendments which added extra details or new legal headings.
 
 
 56
 But it is surely not impossible to allege new issues in amended pleadings. In Klapmeier, the general areas of dispute guarantee and defamation did not include a claim of fraud, just as the surety contract in Christenson and the promissory notes in Transocean Air Lines raised new issues on which a jury trial could be demanded. And whatever the outcome, a court must read the pleadings carefully and fairly before rendering its decision. For example, in Hostrop, although the plaintiff's contract claims were not expressly conveyed by his constitutional claims, the court found them implicit in the original complaint and therefore inadequate to support a new jury demand.
 
 
 57
 Permissible Reliance in this Case. Applying these principles to Andersen's arguments, we find that, despite significant overlaps with the Trustee's claims against the corporate directors, Andersen's liability to the Trustee and the third-party claims between Andersen and Meckler do indeed raise new issues not covered by Meckler's jury demand and as to which Andersen has waived its right to a jury trial. Although the court is mindful of the similarity of evidence against Meckler and Andersen, see note 15 supra, this alone does not decide the questions on appeal. Similarly, even if we accept Andersen's description that "each defendant is claimed to have caused the identical injury to Bermec, for which plaintiff demands identical damages," Appellant's Brief at 12, the harm suffered and the relief sought do not settle the matter of what issues will be raised in adjudging the various defendants' responsibility to compensate Bermec's investors and creditors.
 
 
 58
 Although it would not be enough for the Trustee to point only to the difference in legal theories between Andersen as accountant and Meckler as corporate officer and director, the difference in theories does lead to a substantial difference in the factual issues concerning these defendants. Meckler is charged with willfully and negligently failing to investigate and disclose Dick's defalcations and misrepresentations, which he purportedly discovered sometime in the fall of 1968, during the period between the two purchases. As a result, the Trustee alleged, Bermec suffered severe financial damages, including: (1) the second purchase of overvalued partnership interests; (2) the advancement of moneys and services to a dying business; (3) the failure to rescind the Black Watch purchases while that route was still available; (4) the filing of unlawfully false and misleading documents with the Securities and Exchange Commission; (5) the release for nominal consideration of potentially valuable claims against Dick and his bank; and (6) the general misinforming of Bermec's stockholders and the public. Going beyond mere negligence in corporate management, the complaint also alleged self-dealing by several persons identified as the "Meckler Group," which "(a)t all times mentioned herein ... held a controlling interest in Bermec." Complaint P 2, Appendix at 58. Their decisions in late 1968 and early 1969 on how to handle Black Watch were calculated, in the Trustee's words, "to perpetuate the control of the Meckler Group and protect its investment in Bermec." Complaint PP 66, 106, Appendix at 72, 82-83.
 
 
 59
 All of these injuries and losses were caused, according to the Trustee, by a series of meetings held and decisions made by Bermec's directors and officers between the fall of 1968 when they discovered Dick's wrongdoing and September 1970 when Black Watch filed its bankruptcy petition and Dick's fraud could no longer be concealed. To complicate matters, the Trustee has particularized his allegations about the timing of these meetings and decisions in relation to the various filings and representations and imprudent transactions in lending money and releasing claims. On the claims against the corporate directors, see generally Complaint PP 66-67, 79, 92-103, 107-09, Appendix at 72, 75, 78-82, 83. All of these allegations of corporate wrongdoing, causation and damages raise triable issues of fact, which must be resolved by the jury under Meckler's jury demand.
 
 
 60
 In contrast to his claims against the corporate directors, the Trustee's claims against Andersen raise many issues not covered by the summary above. Andersen is charged with willful, reckless, and negligent investigation and preparation of its June 1968 report on Black Watch's financial condition through March 1968 on which Bermec purportedly relied in undertaking its initial transaction. Complaint PP 160-70, 173-76, Appendix at 94-96, 97.[16] Furthermore, the Trustee alleges that Andersen perpetrated "a fraud and deceit upon Bermec" through its "wilful and reckless disregard of its obligations and duties" in auditing and preparing a balance sheet and statement of operations for Black Watch for the year ending June 30, 1968, which documents became part of a consolidated balance sheet and statement of operations for Bermec and Black Watch for the same period. On these Bermec purportedly relied to its detriment in making the second purchase, in filing misleading SEC forms, and in incurring the various losses attributed to the period from late 1968 through September 1970. Complaint PP 101, 177-86, 193-99, Appendix at 81, 97-101, 101-02.
 
 
 61
 In substantiating his claims about the accountant's wrongdoing, the Trustee alleged that Andersen
 
 
 62
 (f)alsely stated that (its) audit ... was made in accordance with generally accepted auditing standards, in that ... Andersen failed: (1) to insist on adequate evidentiary support for the books and records on which it relied; (2) to evaluate (Black Watch's) internal controls; (3) to perform the necessary auditing checks; (4) to investigate suspicious circumstances; (5) to use reasonable care; and (6) to disclose that (Black Watch) had weak internal controls and that its books and records were poorly kept, inaccurate and generally unreliable.
 
 
 63
 Complaint P 184(d), Appendix at 99. These allegations are not just elaborations on a general charge of negligence or recklessness, such that we might infer the same accusations as part of the claims against the corporate directors. In this portion of the complaint, the Trustee is raising issues specifically applicable to charges of negligent accountancy, issues not involved in claims of corporate mismanagement or self-dealing. By the same token, although Andersen is also charged with negligence generally, Complaint PP 189-92, Appendix at 101, the standard of care for accountants must be informed by the profession's own auditing standards, which again make the issue of Andersen's negligence very different from the issue of corporate negligence. Our holding on this point applies equally to Andersen's June 1968 report and to the results of its audit submitted the following fall. Even though the Trustee's allegations with regard to the first report do not specify the accounting errors allegedly made, we find these issues encompassed in the complaint's reference to Andersen's "obligations and duties ... in the performance of its Investigation and in preparation of its Report." Complaint P 169, Appendix at 96.
 
 
 64
 Also pertinent to this discussion is the hotly contested, but now withdrawn, twenty-eighth claim, in which the Trustee had charged Andersen with aiding and abetting the corporate directors' malfeasance more specifically, failing to disclose the Black Watch fraud, once discovered; failing to minimize Bermec's losses with steps such as rescinding the first purchase, avoiding the second purchase, and refusing to extend additional favors to Black Watch; and issuing unlawfully false and misleading material statements made to the SEC and the investing public. Complaint PP 193-99, Appendix at 101-02, referring back to Complaint PP-76-79, 91-116, Appendix at 74-75, 77-84. Even though, according to Judge Metzner, this was a discontinuance "to which Andersen agree(d)," 83 F.R.D. at 543, Andersen criticizes it on this appeal as a "transparent tactic (which) cannot deprive Andersen of a jury trial for at least two reasons." Appellant's Brief at 13 *. First, "because all defendants are charged as joint tortfeasors causing identical injury, a single jury trial is required regardless of a specific aiding and abetting claim." Second, "rights to a trial by jury (should) be determined as of the time when pleadings are filed by the various parties." Id.
 
 
 65
 Taking these arguments in reverse order, we agree with the second point, but we find in that point appellant's undoing, for Andersen was not part of the action at the time of Meckler's jury demand and the third-party claims had not yet been asserted. On the first point, we have already explained above that this case is not settled by simply labelling Meckler and Andersen joint tortfeasors and characterizing them as therefore indistinguishable from the defendants in Collins. Furthermore, we cannot dismiss the elimination of the aiding-and-abetting charge as immaterial to the jury trial question. In Marshall v. Electric Hose & Rubber Co., 413 F.Supp. 663 (D.Del.1976), a class of black employees and black applicants for employment sued an employer and the unions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., alleging "that the Company and the Unions jointly participated and engaged in a pervasive effort to deprive blacks of employment opportunities because of their race." Id. at 665. There, the court ruled that the employer's general jury demand entitled the unions to a jury trial, despite the differing factual issues raised,[17] because of "the joint nature of the alleged wrongful conduct." Applying this principle to Andersen's circumstances, we are satisfied that the absence of allegations amounting to a conspiracy charge makes the issues sufficiently divisible for trial purposes that Meckler's and Andersen's liability to the Trustee can be decided by the jury and court respectively.
 
 
 66
 On the other hand, even without the aiding-and-abetting claim that is, an express allegation of concerted joint action many of the issues covered by Meckler's jury demand are also raised by the third-party claims and the Trustee's claims against Andersen. Although we disagree with Andersen's representation that "virtually every issue of fact" must be relitigated in the multiple trials contemplated by Judge Metzner, its list of issues is a helpful starting point. Appellant's Brief at 9.
 
 
 67
 Meckler's jury demand embraced at least the issues of (a) the existence of fraud at Black Watch Farms, (b) the knowledge of the Bermec Board in 1968 and 1969, (c) any damage to Bermec and the amount and cause thereof, (d) Meckler's liability for any damages to Bermec, and (e) the falsity of the 1968 annual report and consolidated financials.
 
 
 68
 Id. at 16 (footnote omitted). All of these will most likely arise in litigating the Trustee's claims against Andersen. Although Meckler and Andersen have both admitted the existence of fraud at Black Watch, their admissions are only on information and belief, and the details of the fraud remain to be established. Meckler's Answer PP 26, 33-36, Appendix at 169, 171-72; Andersen's Answer PP 31, 33, 36, Appendix at 113-14. Bermec's knowledge of the fraud will be crucial to the issues of reliance and causation both for Meckler's liability and for Andersen's. The amount of damages suffered as a result of the Black Watch fraud in part from the direct outlay of money, in part from the rippling financial consequences will determine the outer limit of Meckler's liability, which in turn sets the limit on Andersen's liability. Meckler's liability, the heart of the Trustee's claims of corporate mismanagement, will also be the heart of Andersen's defense. Appellant's Brief at 17. Finally, the truth or falsity of the 1968 financial reports must be determined before deciding whether Meckler and/or Andersen is legally liable for it, and whether the company relied to its detriment on any falsity uncovered. Complaint PP 95, 97, 100-01, Appendix at 78-81.
 
 
 69
 All of these issues are embraced by Meckler's jury demand, and Andersen therefore is entitled to benefit from the jury's findings on them to the extent that they inform a decision on Andersen's liability. Moreover, Meckler and Andersen are entitled to have their third-party claims adjudicated in light of the jury's findings on these issues to the extent they are raised by the claims for contribution and indemnification. And we reiterate that, ultimately, our view of this matter is not based solely upon convenience or overlapping evidence or similarity of legal theories, but upon the parties' entitlement to a jury's determination of those issues for which a valid demand is in effect.
 
 
 70
 We are mindful of the potential burdens on the parties in splitting the case's issues between court and jury. Both factfinders will have to hear much of the same evidence, and Meckler and Andersen will each want to participate in the other's trial because of the third-party claims which rest upon their liability, if any, to the Trustee. In addition, even though the court will decide the third-party issues (because Meckler's demand did not cover these claims), Meckler's liability to the Trustee (as determined by the jury) will underlie any decision on Andersen's derivative responsibility to the corporate directors. We are confident that Judge Metzner will take these problems into account when he arranges further proceedings in this case. See, e. g., Mealy v. Fidelity Nat'l Bank, 2 F.R.D. 339, 339-40 (E.D.N.Y.1942).
 
 CONCLUSION
 
 71
 We find that Meckler's jury demand does not serve as a general demand for purposes of the Trustee's claims against Andersen or for Meckler's and Andersen's cross-claims. Either party connected with those claims could have ensured a jury trial on the issues raised by simply indorsing their pleadings or filing a supplemental demand. Neither of them did so, and we are unwilling to dispense with the technical requirements of Rule 38, especially when they are so easy to follow and when allowing less than technical compliance threatens to entangle the courts routinely in slippery factual inquiries where the Rule contemplates only a simple procedural inquiry.
 
 
 72
 On the other hand, to the extent that Meckler's demand "embraces" issues involving Andersen, Andersen may rely on it and will be considered to have complied with Rule 38. But to determine the scope of Meckler's demand, the court could not avoid the sort of detailed and thorough review of pleadings and issues which Rule 38 makes unnecessary in most cases. Our findings, explained above, will not be repeated here, but we will urge that in the future the parties to complex litigation be more careful in protecting their jury trial rights and in sparing the courts and themselves avoidable expense, effort and delay by expressing their intentions clearly and in a timely fashion.
 
 The Trustee makes much of the fact that
 
 73
 this is not a case in which a party in good faith reliance on the jury demand of another party failed to serve its own demand. On the contrary, Andersen has never claimed it relied on Meckler's demand; it only claims that it was entitled to rely thereon, based on the fortuitous discovery of a jury demand made by Meckler to a complaint in which Andersen was not named as a party.
 
 
 74
 Appellee's Brief at 6; Letter from Richard I. Donner, dated Sept. 26, 1980 (post-argument) at 6. We will neither inquire about nor pass judgment on whether Andersen actually relied on Meckler's demand, or inadvertently waived its jury right without knowledge of that demand, or intentionally waived its right while fully aware of the existing demand, or perhaps never considered the jury issues and serendipitously stumbled upon the demand after the jury in State Mut. Life Ins.,[18] supra, deadlocked as to Andersen's liability. While these questions might cast some extra light on the issues in this case, we vehemently decline to open that proverbial can of worms, or that can of proverbial worms, however the case may be. Under the simple, clear mandate of Rule 38, it is only a rare jury demand which will require the extensive litigation and discussion given in this case, but at least we limit ourselves here to the face of the pleadings in reaching our decision. But we will not, as a matter of routine, ask about the actual reliance of parties on each other's demand. Special circumstances may require such an inquiry, e. g., State Mut. Life Ins., supra, but that is not called for here. To us, the crucial fact is that Meckler complied with Rule 38 in making a general jury demand, the breadth of which we have interpreted above. Until it is withdrawn with the consent of the concerned parties, they may rely upon it. To protect that justifiable reliance, the court below shall continue its proceedings in accordance with the directions spelled out in this opinion.
 
 
 75
 Modified and remanded.
 
 
 
 *
 Hon. Charles H. Tenney, Senior District Judge of the Southern District of New York, sitting by designation
 
 
 [1]
 This case was filed in the Southern District of New York and was assigned to Judge Metzner, who is also presiding over Bermec's liquidation, which began in April 1973 after efforts to reorganize the company were abandoned. Appellee's Brief at 3. Because of the judge's dual role, Andersen moved for his recusal, and the motion was denied. On the basis of Judge Metzner's views on this question, we affirm his decision not to recuse himself. 83 F.R.D. 540, 544-46 (S.D.N.Y.1979). The authorities cited by Andersen in support of its motion are clearly distinguishable. In American Employers' Ins. Co. v. King Resources Co., 545 F.2d 1265 (10th Cir. 1976), the judge refused to consolidate nine actions because the outcome in some of the cases would determine whether certain business entities in the other cases could be revived or would have to be liquidated. Bermec's liquidation, however, has already been ordered; there is no hope of reviving the company if the Trustee's current claims are successful. See also Carpenter v. Hall, 352 F.Supp. 806, 814 (S.D.Tex.1972); In re Four Seasons Sec. Laws Litigation, 328 F.Supp. 221 (Jud.Pan.Mult.Lit.1971); In re Penn-Central Sec. Laws Litigation, 322 F.Supp. 1021, 1023 (Jud.Pan.Mult.Lit.1971). Andersen also cites United Family Life Ins. Co. v. Barrow, 452 F.2d 997 (10th Cir. 1971), a case wholly inapposite. There, the judge was a personal friend of the persons whose financial reorganization could not succeed without a recovery on insurance contracts which were the subject of another case before the same judge. No such personal bias is in any way suggested by the facts of this case
 
 
 [2]
 Herman L. Meckler, the former chairman and chief executive officer of Bermec, and Herbert R. Degnan, Bermec's vice president, treasurer and chief financial officer, answered jointly, but because Degnan has been dismissed from the suit after settling with the Trustee, their joint answers (and their jury demand, discussed below) will be referred to as Meckler's
 
 
 [3]
 Specifically, Jack R. Dick, the principal stockholder, president, and chief executive officer of Black Watch, was alleged to have defrauded Bermec through a series of shams. First, before any negotiations began with Bermec, Dick purportedly embezzled Black Watch's funds by submitting fraudulently inflated invoices for the livestock he purchased and then forging his suppliers' endorsements to cash checks for his own use. Next, Dick improperly warranted to his cattle buyers the productivity they could expect from his livestock, thereby incurring enormous potential liabilities. Finally, in making his sale to Bermec, Dick materially and fraudulently misled the company through the following: (1) overstating the net income; (2) overstating the value of herds; (3) failing to disclose the potential and in some cases, actual liability to sales personnel and cattle buyers; (4) failing to disclose Dick's embezzlements through the invoice and forgery scheme; and (5) generally representing the financial records presented for examination as fair reflections of Black Watch's worth and operations
 
 
 [4]
 Empire National Bank; Peat, Marwick; and the estate of Jack Dick, now deceased, have all settled with the plaintiff Trustee, but the case is proceeding, ponderously, toward trial on the rights and liability of the corporate defendants and several defendants added in the second amended complaint, discussed below
 
 
 [5]
 In connection with its motion for a separate court trial on Andersen's liability, the plaintiff requested permission to withdraw the twenty-eighth claim in its complaint. Appendix at 186. This claim, citing Andersen as an aider and abettor in the corporate directors' malfeasance, was withdrawn with Andersen's agreement. 83 F.R.D. at 543
 
 
 [6]
 Counsel on both sides of this controversy have argued in their briefs and in letters to the courts about the details in the record. Appellant's Brief at 4-5; Appellee's Brief at 5-6; Letter from Peter Fleming, Jr., dated Sept. 25, 1980 ("Fleming Letter") (after oral argument); Letter from Richard I. Donner, dated Sept. 26, 1980 ("Donner Letter"). For example, Andersen points out (1) that the Trustee's counsel sought to add Andersen as a defendant in the second amended complaint because its "liability arises out of the same occurrences and series of transactions" as the liability of the original defendants, Affidavit of Emanuel Dannett, sworn to Feb. 28, 1974, Appendix at 53; (2) that Judge Metzner and counsel for both sides made reference to a jury trial in a settlement hearing held on May 8, 1978, Transcript at 9, 11, 12, 15, 18, 22, Exhibit to Fleming Letter; and (3) that the Trustee brought on its motion against a jury trial in the face of the parties' clear understanding that Meckler's jury demand would cover all issues in the case
 In opposition, the Trustee points out (1) that Andersen's counsel took over its representation by Consent Order dated July 5, 1977, subject to Judge Metzner's condition that they "will be bound by everything that has occurred to date," Exhibit II to Donner Letter, at 2; (2) that Empire National Bank's counsel withdrew a jury demand on the understanding (conveyed by its codefendants' attorneys who were not served with Meckler's demand) that the case would be tried to the court. Affidavit of Richard I. Donner, sworn to Dec. 22, 1978, P 12, an assertion to which Andersen has never objected; (3) that Andersen has silently accepted others' statements that Meckler's jury demand may have been ineffective as to some or all of the case's issues, e. g., Transcript of Pretrial Conference, dated June 22, 1977, at 39-41, Exhibit I to Donner Letter; and (4) that the Trustee brought on its motion on the jury questions at Judge Metzner's suggestion, made during an unrecorded, informal settlement hearing on October 31, 1978, Donner Letter at 4.
 This last issue of who prompted the Trustee's motion has led to a particularly roundabout argument on whether a jury trial was contemplated by the parties. Andersen would have the court view this motion as a tacit admission that the parties had formerly foreseen a jury trial. "(I)f plaintiff had actually always believed that this case was a non-jury case, there would have been no need for plaintiff to file a formal motion for a non-jury trial." Fleming Letter at 1-2; Reply Brief at 24. To the court's ear, Andersen's characterization of the Trustee's motion sounds like Hamlet's words to his mother: "The lady doth protest too much, me thinks." Shakespeare, Hamlet, Act II, Scene II, line 242. Even if this line elegantly captures a useful bit of human insight, it cannot be applied directly to the realm of litigation. Under the precepts of modern pleading, a complete record, covering all of the disputed points, is preferable to a record left incomplete because of strategic inclusions and exclusions by the parties, waiting for the opponent to raise a question, and thereby hoping to gain some implicit advantage on the issue involved. Motive, or the impetus for asking a question, standing alone, can never decide a motion or a case. Moreover, the court doubts whether Andersen would want its insights applied throughout this decision. See Appellee's Brief at 6 ("Andersen's newfound desire for a jury trial comes, perhaps not coincidentally, on the heels of the State Mutual (Life Ins. Co. v. Arthur Andersen & Co., supra ) trial in which the jury, after a seven-month trial and 21 days of deliberation, deadlocked as to Andersen's liability.").
 
 
 [7]
 The background of State Mutual is closely related to the dispute in this case. There, Andersen was sued by various insurance companies who had lent money to Black Watch during a period when Andersen served as its accountant. Andersen impleaded Black Watch's principal banker, Empire National Bank ("Empire"), and Meckler, who had become Black Watch's chairman and chief executive officer, but Andersen did not make any jury demand. The plaintiffs then amended their complaint naming Empire and Meckler as defendants. In answering both of these complaints, Empire and Meckler demanded a jury trial a critical fact distinguishing State Mutual from this case, where Meckler did not make a jury demand in regard to the third-party claims between himself and Andersen. Because of their multiple jury demands, Empire and Meckler were entitled to a jury trial on their own liability to the plaintiffs and on Andersen's liability to the plaintiffs, which formed the basis for Andersen's third-party claims. "Thus (the district court) was confronted with multiple parties asserting a complex series of claims, and no possibility of avoiding a jury trial as to all of them, at least with respect to some parties (Empire and Meckler)." Id. at 1048. The judge therefore ordered a unified jury trial of all issues in the case
 After a seven-month trial and twenty-one days of deliberations, the jury found Empire liable, found Meckler not liable to the plaintiffs or to Empire, and deadlocked as to Andersen's liability. Thereafter, the judge ordered a retrial to the bench on the issue of Andersen's liability. On interlocutory appeal, the court overturned that order, stating that "(i)n the absence of an express decision by the judge (before the first trial) that ... plaintiffs' claims against Andersen were being tried to him rather than to the jury, Andersen was entitled to conclude that it had been relieved of its waiver." Id. at 1050. In addition, because Empire was still entitled to a jury's determination of Andersen's liability, there was a great risk of duplicate efforts and inconsistent judgments.
 The appeals court in State Mutual based its decision on the facts, practicalities and equities of the case. But because of the differences between State Mutual and this case, highlighted above, and because of our view of the jury trial procedures, discussed below, we can decide this case by simply enforcing the procedural rules strictly, while recognizing that State Mutual demonstrates the flexibility available in appropriate cases.
 
 
 [8]
 There is a possibly problematic difference between subsection (b) governing jury demands and subsection (d) governing waivers. Rule 38(b) requires only service of the demand for an effective invocation of the right, whereas 38(d) speaks, in the conjunctive, about failing to serve and failing to file. Apparently, if a party fails to serve or fails to file, there has been no waiver. If a party has properly served the other parties, but failed to notify the court, a ruling that the demander has not waived the jury right is still fair to the other litigants, even if inconvenient for the court. On the other hand, if a party files a jury demand, but fails to serve it on the other parties, it would be manifestly unfair to say that he is nonetheless entitled to a jury trial. Biesenkamp v. Atlantic Richfield Co., 70 F.R.D. 365, 366 (E.D.Pa.1976). This circumstance could be handled by saying that, even if a party who fails to serve his demand has not formally waived the jury right under 38(d), he or she has effectively waived it because subsection (b)'s ten-day limit precludes an effective demand
 Addressing this problem generally, Professor Moore suggests that the rules on demand and waiver "should be fairly applied. In the event it is clear that the applicable provisions of subdivisions (b) and (c) ... have not been observed, then the waiver provisions ... should be enforced, subject, of course, to discretionary relief ... pursuant to Rule 39(b)." 5 Moore's, supra, P 38.43, at 38-380. Our decision need not resolve this problem, however, because we have found that Meckler has properly filed his demand. The effect of his serving the demand on the plaintiff alone will be discussed below.
 
 
 [9]
 Rule 5 of the Federal Rules of Civil Procedure supports this view. It provides in pertinent part:
 (a) Services: When Required. Except as otherwise provided in these rules, ... every ... demand ... shall be served upon each of the parties.
 
 
 [10]
 Trustee cites the decision in Biesenkamp v. Atlantic Richfield Co., 70 F.R.D. 365 (E.D.Pa.1976), on the question of inadequate service. Appellee's Brief at 9. But as Andersen correctly points out, Reply Brief at 3, the plaintiff Biesenkamp never served any of the defendants with his jury demand, which was indicated only on the cover sheet of the court's records. Because the Trustee was in fact served with Meckler's demand, the present case is distinguishable from Biesenkamp, which represents the rare occurrence of notice to the court without notice to the other parties
 
 
 [11]
 Another Second Circuit decision dealing with the right to a jury trial, Heyman v. Kline, 456 F.2d 123 (2d Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972), supports our refusal to infer a retraction of Meckler's demand from the statements and representations of the parties in proceedings after the demand was made. There, in a conference held to schedule a hearing on preliminary matters, the trial judge "noted in passing that this was a 'non-jury trial,' " id. at 129, to which the attorneys present did not object. The defendant's answer and counterclaims, filed after this conference, were accompanied by a written demand for a jury trial. Id. at 128. On appeal, this court reversed the lower court's finding of a waiver, holding that a waiver before Rule 38's 10-day period has run "should be based on nothing less than an affirmative representation by the party himself, or by his duly authorized counsel." Id. at 130. By the same token, we hold that a retraction must be based upon the express acts required by Rules 38(d) and 39(a), not upon the uncertain meanings implied by the lengthy, complicated record in this case
 
 
 [12]
 The court is well aware of the ironies of this case. We have ruled that Meckler may rely on his own demand as to any issues raised by the Trustee's claims, whether they arose originally or in subsequent pleadings. We have also ruled that Andersen may rely on Meckler's demand to the extent of issues raised by the Trustee as embraced therein. But we will not permit Andersen to rely generally on Meckler's demand as to the Trustee's charges of accounting errors. Nor will we permit Meckler and Andersen to demand a jury trial on their third-party claims
 The concise, but complete explanation of these apparent inconsistencies is that neither Meckler nor Andersen expressed a jury demand at any time or on any pleadings pertinent to those issues as to which we have found the jury right waived, and we are not willing to abandon the simple, clear instructions of Rule 38 in order to relieve them of that waiver. No extenuating circumstances prevail in this case, and we will enforce Rule 38 according to its terms. See note 7 supra.
 
 
 [13]
 Both sides have cited Plechner v. Widener College, Inc., 569 F.2d 1250 (3d Cir. 1977), as additional support for their positions. Appellant's Brief at 10; Appellee's Brief at 13. There, the plaintiff was a college trustee seeking cancellation and rescission of a corporate transaction undertaken by the college. He demanded a jury trial on the "Damage Counts." Two months later an intervenor plaintiff joined the suit and filed a complaint "which closely tracked the three counts in the Plechner pleading." 569 F.2d at 1256. In a footnote, the Third Circuit cited Collins for the proposition that the intervenor "was not required to repeat the jury demand on counts which were essentially the same as" Plechner's. Id. at 1256 n.3. But the court went on to uphold the lower court's ruling that neither the plaintiff nor the intervenor had sought any legal relief entitling them to a jury trial. The opinion is not very helpful, however, in understanding when one claim is "essentially the same" as another, and, therefore, just as Plechner relegated Collins to a footnote, we do the same with Plechner
 
 
 [14]
 In its brief, Andersen states:
 It is therefore clear that each defendant is charged as a joint tortfeasor in that the alleged fraud of each defendant is claimed to have caused the identical injury to Bermec, for which plaintiff demands identical damages.
 Appellant's Brief at 12.
 
 
 [15]
 In full, Paragraphs 31 and 38 of the Trustee's Affidavit provided as follows:
 
 
 [31]
 The proposed defendants are proper parties in this action as their liability arises out of the same occurrences and series of transactions upon which the claims against the original defendants are predicated and common questions of law and fact will arise as to the parties against whom suit has already been brought and proposed defendants. In fact, the evidence needed to establish the liability of these proposed defendants will in great part be the same as that which will be offered at trial against the original defendants
 
 
 [38]
 In sum, plaintiff requests leave to join Chadbourne Parke; Andersen; and Bonura as party defendants to this litigation in order that all plaintiff's claims arising out of Bermec's acquisition may be pursued and decided in a single litigation, thus avoiding duplication of time, money and effort on the part of plaintiff and the Court in order to resolve this dispute
 
 
 [16]
 It is unclear from the pleadings whether the corporate directors are charged with mismanagement in connection with the first purchase of Black Watch's assets. Judge Metzner stated in his opinion below that "(t)he action against Meckler and the other directors is not the subject of any pre-acquisition claim asserted by the plaintiff," 83 F.R.D. at 543. See also Appellee's Brief at 15-17 ("The heart of the (Trustee's) case against Meckler is that upon learning of the Defalcations in November 1968 he failed to take steps to investigate their magnitude and effect on Black Watch.... (N)o claim has ever been made by (the Trustee) against Meckler with respect to ... Bermec's acquisition of Dick's interests in July 1968.")
 The complaint, however, is subject to a different reading. It alleges that Dick furnished Bermec and Andersen with false and misleading financial records in the course of negotiations in May 1968, Complaint P 36, Appendix at 65, and it alleges generally that the directors "negligently failed to perform their duties" in connection with all of the facts alleged throughout the first third of the complaint. Complaint PP 72-73, Appendix at 73. In response, Meckler generally denied any negligence, Meckler's Answer P 48, Appendix at 174, and he specifically "aver(red) that (he) ... did not know and had no reason to know the falsity" of the records provided by Dick and referred to in Paragraph 36 of the complaint.
 At a minimum, this exchange suggests that the Trustee does raise claims of corporate wrongdoing in connection with the first purchase, albeit of a different sort from his claims about the Meckler Group's later-acquired firsthand knowledge of Dick's fraud. On the other hand, even if both Andersen and Meckler are charged with breaching their duties in the spring of 1968, the issues involved in the corporate charges are just as different from the issues surrounding Andersen's liability for the June 1968 report as the issues involved in the directors' subsequent firsthand knowledge are different from the issues surrounding Andersen's liability for its reports and certifications in the fall of 1968.
 
 
 [17]
 The court described the plaintiff's allegations as follows:
 Plaintiffs contend that the Company engaged in a wide range of discriminatory employment practices including, inter alia, restricting blacks to less desirable job categories, using the seniority system to perpetuate racially segregated departments, administering racially biased application and advancement tests, denying blacks equal opportunities with whites to participate in job training programs, administering health and safety regulations in a racially discriminatory fashion, and treating whites preferentially in awarding salaries and other employee benefits. The Unions are accused of actively encouraging, assisting and acquiescing in the Company's racially discriminatory acts and practices, contrary to the Union's duties and obligations by refusing to process grievances for their black members and by failing to represent black members equitably during bargaining with the Company. Thus, in substance, the plaintiffs contend that the Company and the Unions jointly participated and engaged in a pervasive effort to deprive blacks of employment opportunities because of their race.
 
 
 [18]
 See note 7 supra