**SOUND VIDEO UNLIMITED, INC., and Electratainment, Inc., Plaintiffs,**

v.

**VIDEO SHACK INC., Arthur H. Morowitz, Howard J. Farber, Arthur C. Zwemke and Howard P. Levine, Defendants,**

v.

**Noel GIMBEL and Lee Gimbel, Additional Defendants on the Counterclaims.**

No. 83 Civ. 5853 (GLG).

United States District Court, S.D. New York.

Nov. 9, 1988.

---

131

Sonnenschein Carlin Nath & Rosenthal (Bernard Nussbaum, Robert B. Millner, Richard L. Fenton, of counsel), Rudnick & Wolfe (Stanley J. Adelman, of counsel), Chicago, Ill., for plaintiffs and additional defendants on the counterclaims.

Frankfurt, Garbus, Klein & Selz, P.C. (Martin Garbus, of counsel), Mark A. Reich, New York City, for defendants.

## OPINION

GOETTEL, District Judge.

This case arises from the acrimonious divorce of two large video equipment companies. Although the essential facts are largely disputed, we will attempt herein to lay out the romance, union and separation of the plaintiffs and the defendants that gave rise to this lawsuit. The parties have filed a total of 7 motions that we rule on herein. They will be addressed in turn.

## I. FACTS

In the summer of 1981, Arthur Morowitz ("Morowitz"), president of Video Shack, Inc. ("Video Shack"), a large video cassette retailer and wholesaler, entered into discussions with Noel Gimbel ("Gimbel"), president of Sound Video Unlimited, Inc. ("Sound Video"), a large video cassette and record wholesale distributer, about combining the resources of the two companies to create the "premier company in the video business." Video Shack is a New York corporation with its principal place of business in New York, New York. Sound Video is a Delaware corporation with its principal place of business in Niles, Illinois. In contemplation of the consolidation, Sound Video assumed responsibility for all wholesale operations, including Video Shack's New York wholesale business, A & H Video Sales Representatives ("A & H"). A & H was operated under the name of Sound Video beginning in January 1982.[1]

In March 1982, Gimbel, Morowitz, and Howard Farber ("Farber")[2] executed a Reorganization Agreement[3] and Shareholder Agreement to give corporate form to the business combination.[4] The Reorganization Agreement provided for Sound Video's parent company, Electratainment, Inc. ("Electratainment"), to acquire all of the outstanding shares of Video Shack stock in exchange for 45% of the outstanding shares of Electratainment stock. The agreement further provided that Morowitz was to become a director and the president of Electratainment and Farber was to become a shareholder of Electratainment. Gimbel was to become Chairman of the Board of Electratainment. The positions of chairman and president were to be alternated yearly between Gimbel and Morowitz. The Shareholder's Agreement provided that of the five member board of directors of Sound Video, Gimbel would elect three directors and Morowitz would elect two directors. Correspondingly, of Video Shack's five directors, Morowitz would elect three and Gimbel would elect two.

In July 1982, however, the combination was aborted and this lawsuit ensued.[5] The plaintiffs' Consolidated Amended Complaint raises 21 claims against the defendants including 6 counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, 5 counts of common law fraud, 2 counts of conversion, 2 counts of breach of fiduciary duty, 2 counts for punitive damages and one count each of breach of contract, promissory estoppel, federal securities fraud and an action for an accounting. The defendants have asserted 11 counterclaims against the plaintiffs Sound Video and Electratainment, as well as Noel Gimbel and Lee Gimbel including 3 counts of breach of contract, 2 counts for rescission, 1 count each of fraud, conversion, securities fraud and RICO as well as a claim for a declaratory judgment and a claim for an accounting.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The defendants have moved herein for partial summary judgment. For the following reasons, we grant the motion in part and deny it in part.

### A. *Summary Judgement Standard*

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a material, factual dispute. Fed.R.Civ.P. 56(e); *Adickes v. S.H. Kress*

---

1. As part of the agreement, Video Shack transferred the inventory, accounts receivable and cash of A & H to Sound Video.

2. Howard Farber was an officer and agent of Video Shack.

3. Lee Gimbel, an employee, shareholder and officer of Sound Video and shareholder of Sound Video's parent company, Electratain-

ment, signed the Reorganization Agreement as an attesting witness. *See infra* Part III.

4. Lee Gimbel executed the Shareholder Agreement along with Gimbel, Morowitz and Farber.

5. Because the procedural history of this case is voluminous and largely irrelevant to this motion, we will not delineate it here.

& Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If that burden is met, the non-moving party cannot simply rest on their complaint setting forth a valid cause of action. Fed.R.Civ.P. 56(e); *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). They "must set forth specific facts showing that there is a genuine need for trial," Fed.R.Civ.P. 56(e), and there must be more than merely "some metaphysical doubt as to [those] material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In determining whether that burden is met, however, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). In what has now been dubbed the 1986 Supreme Court "trilogy," the Court reaffirmed its support for Rule 56 as an important procedural tool. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Against this backdrop of summary judgment jurisprudence, we turn to the defendants' motion.

## B. *Choice of Law* [6]

The defendants argue that New York law governs all the common law claims in this action. The parties have conceded that, with respect to the elements of proof for fraud and breach of fiduciary duty (the common law issues raised in these motions), the laws of New York and Illinois do not differ. Accordingly, we will apply the law of the forum, New York, on those issues.

The crux of the choice of law dispute in this case revolves around the availability of lost profits as a measure of damages in plaintiffs' common law actions. The defendants argue that New York law applies to the lost profits analysis and does not permit recovery of lost profits for fraud, conversion, breach of contract, or breach of fiduciary duty. The plaintiffs urge application of Illinois law which permits lost profits, at least for fraud, breach of fiduciary duty and conversion.[7]

As a preliminary matter, we note that we must apply the choice of law rules of the forum state. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *O'Connor v. Lee–Hy Paving Corp.*, 579 F.2d 194, 205 (2d Cir.), *cert. denied*, 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978). The leading New York case on choice of law is *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). In *Schultz*, the New York Court of Appeals determined that when "the parties are domiciled in different jurisdictions with conflicting loss-distribution rules ... the law of the place of the tort will normally apply, unless displacing it " 'will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.' " *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 98, 480 N.E.2d 679, 687 (1985) (quoting *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 70, 286 N.E.2d 454, 458 (1972)). *Accord In re AM Int'l, Inc. Securities Litigation*, 606 F.Supp. 600, 609 (S.D.N.Y.1985); Restatement [Second] of Conflicts of Law § 145 comment c, at 416 (1971).[8] In determining "the place of the tort" in a case where the

---

6. At this juncture, we rule only on the law applicable to the issues raised in this wave of motions. Choice of law determinations on issues outside the scope of these motions must await another day.

7. The plaintiffs argue, alternatively, that New York law would permit recovery of lost profits for common law fraud. For a complete discus-

sion of the defendants' motion to dismiss the plaintiffs' claim for lost profits, see *infra* Part II, F.

8. At issue in this motion is the question of lost profits. Because this issue goes to the allocation of damages, it is properly characterized as a "loss-distribution" rule.

conduct occurred in one jurisdiction and the injury was felt in another, "the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 94, 480 N.E.2d 679, 683 (1985).

In this case, plaintiff Sound Video is a Delaware corporation with its principal place of business in Niles, Illinois. Plaintiff Electratainment is also a Delaware corporation with its principal place of business in Niles, Illinois. Defendant Video Shack is a New York corporation with its principal place of business in New York, New York. By the allegations of the Consolidated Amended Complaint, the defendants made representations to the plaintiffs in person and by telephone in Niles, Illinois and New York, New York. The plaintiffs were injured, however, in their business in Illinois, primarily by virtue of their injured credit relationship with their Chicago, Illinois bank. As injury is "the last element necessary to make the actor liable" *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 94, 480 N.E.2d 679, 683 (1985), in fraud and related actions, we hold that the place of wrong in this case was Illinois. Accordingly, unless application of New York law "will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants," *Neumeier v. Kuehner*, 31 N.Y. 2d 121, 128, 335 N.Y.S.2d 64, 70, 286 N.E. 2d 454, 458 (1972), Illinois law will govern the substantive issues of the plaintiffs common law tort actions to the extent that it differs from the law of New York.

The defendants have advanced no substantial reason why New York law should be applied in this case. In support of their argument, the defendants rely on the Order of United States District Judge George Leighton, of the Northern District of Illinois, transferring the plaintiffs' case to this district. In his memorandum decision, the defendants argue, Judge Leighton determined that the majority of events underlying the complaint occurred in New York. New York, however, has clearly rejected the aggregation of contacts approach to choice of law. *In re AM Int'l, Inc. Securities Litigation*, 606 F.Supp. 600, 609 (S.D. N.Y.1985); *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). Rather, in tort cases such as this one, New York utilizes the rule of *lex loci delicti*. *See supra*. The defendants argue that New York law should apply even under the "place of the wrong" rule, because "[t]he great bulk of the significant events underlying the complaint occurred in New York. It is in the warehouse in New York that inventory was allegedly converted and commingled." *Sound Video Unlimited, Inc. v. Video Shack, Inc.*, No. 82–4956, Slip op. at 9 (N.D.Ill. July 14, 1983). It appears that the plaintiffs' claims of converted inventory have been discontinued and that the Consolidated Amended Complaint before this court is substantially different from the Complaint addressed by Judge Leighton. Regardless, the occurrence of events in New York does not mean that the tort arose in New York. As stated above, the place of the wrong is determined by the place where the last event giving rise to a cause of action occurred. Here, that place is Illinois. Accordingly, Illinois law will govern the substantive issues of this case to the extent that it differs from the law of New York.

### C. *The Fraud Claims* [9]

The defendants contend that they are entitled to summary judgment on the fraud claims because the plaintiffs cannot establish the existence of fraud by clear and convincing evidence. As noted above, the defendants carry the burden of proving the absence of any genuine issue of material fact. It is clear, however, that the fraud issues of this case are laden with factual disputes. The plaintiffs' fraud allegations rest largely on statements made by the defendants which were allegedly fraudu-

---

**9.** The parties have conceded that New York and Illinois law do not differ on the elements of a common law fraud cause of action.

lent when made and induced injurious reliance by the plaintiffs. The defendants correctly note that fraud cannot be inferred solely from the failure of an event to occur. *See Hoffman v. Playmates of Miami, Inc.,* 22 A.D.2d 674, 253 N.Y.S.2d 307, 308 (1st Dept. 1964). The plaintiffs, however, have alleged that the defendants' misrepresentations were made as part of a scheme to assume control of Sound Video and, as such, knew such statements to be false at their making. Because the defendants dispute this allegation, a material, factual issue exists as to the defendants' intentions at the time of the business combination.[10] Resolution of this issue on summary judgment, therefore, is inappropriate. The fraud issue largely hinges upon the credibility of the various parties to the alleged fraud and the believability of their testimony as to what statements were made and with what intention. *See ACLI Int'l Commodities Serv., Inc. v. Banque Populaire Suisse,* 609 F.Supp. 434, 449 (S.D.N.Y.1984) ("[S]ummary judgment should be cautiously invoked in fraudulent inducement cases, which raise issues that often turn on credibility or inference, such as intent and reliance."). Such a determination will necessitate credibility assessments which are exclusively within the province of the jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed. 2d 202 (1986). Accordingly, the defendants' motion for summary judgment against the plaintiffs dismissing the fraud claims is denied.

### D. *The Rico Claims*

The defendants move to dismiss the various RICO claims, contending that the plaintiffs can prove neither the existence of an "enterprise" operated through a "pattern of racketeering" nor that they suffered a RICO injury.

#### 1. "Enterprise" Requirement

A violation of 18 U.S.C. § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activi-

ty." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed. 2d 346 (1985). The plaintiffs allege three alternative enterprises: Video Shack, Sound Video and Electratainment. The defendants' first contention is that to the extent that Video Shack is named as a defendant, it may not also be the RICO enterprise. *See Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Anitora Travel, Inc. v. Lapien,* 677 F.Supp. 209, 219 (S.D. N.Y.1988); *Richter v. Sudman,* 634 F.Supp. 234, 240 (S.D.N.Y.1986). The plaintiffs conceded this point in responsive papers to the defendants' earlier summary judgment motion. Accordingly, we grant summary judgment to defendant Video Shack on Counts I and XI of the Consolidated Amended Complaint.

#### 2. "Pattern" Requirement

The defendants move to dismiss the RICO counts against the remaining defendants on the ground that the plaintiffs cannot establish a continuing enterprise or pattern of racketeering activity. To establish a RICO violation in this Circuit, the plaintiffs must prove, *inter alia,* "the existence of an enterprise whose illicit activities or unlawful goals are continuing ones." *Creative Bath Products, Inc. v. Connecticut Gen. Life Ins. Co.,* 837 F.2d 561, 564 (2d Cir.1988). The Second Circuit has held that " 'three supposedly fraudulent actions taken during the course of a single "scheme" involving a single transaction, ... cannot justifiably be deemed to satisfy RICO's requirement that there be a "pattern" of racketeering activity.' " *Id.* at 563 (quoting district court's memorandum decision). Similarly, in *Beauford v. Helmsley,* 843 F.2d 103, 108 (2d Cir.1988), *rehearing en banc granted* (April 13, 1988), the Second Circuit held that a discrete scheme is not sufficient to satisfy the continuing enterprise requirement of RICO. The *en banc* ruling in *Beauford,* however, is likely

---

**10.** The plaintiffs claim, *inter alia,* that Morowitz repeatedly promised to pledge Video Shack's assets as loan collateral for Sound Video. Morowitz vigorously denies making such a prom-

ise. This issue goes to the heart of many of the plaintiffs' claims. It is clearly a factual issue that cannot be decided on summary judgment.

to change the state of the pattern requirement in this Circuit. Moreover, the Supreme Court is currently reviewing RICO's pattern requirement in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 829 F.2d 648 (8th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988). We feel it would be injudicious for us to proceed in the face of such unsettled law. Accordingly, we will await decision in *Beauford* and *H.J. Inc.* before deciding the defendants' motion for summary judgment on the RICO claims to the extent that they rely on a failure to meet the pattern requirement.

### 3. RICO Injury

The defendants further contend that the RICO claims must be dismissed because the plaintiffs have not been injured in their business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The plaintiffs allege that as a result of the defendants' misconduct, Sound Video's credit relationship with its lender was severely constrained, thereby preventing Sound Video from buying and distributing video products at time when the market was expanding rapidly. The defendants counter that even assuming that they could be held liable under 18 U.S.C. § 1962(c), they could not have cause any injury to Sound Video because Sound Video's relationship with its bank had already deteriorated, independent of defendants' involvement. Specifically, the defendants contend that (1) The First National Bank of Chicago ("First Chicago") had been insisting that Sound Video reduce their level of over-leveraged debt, independent of any pledge of assets by Morowitz; (2) First Chicago had already decided not to continue to extend credit to Sound Video; and (3) Sound Video had misrepresented its net worth to First Chicago.

■ The plaintiffs hotly contest all of the defendants' contentions, asserting that their credit relationship with First Chicago was sound. Moreover, they assert that their injured credit relationship with First Chicago was not their only business injury. The plaintiffs contend that they suffered substantial injury as a result of cash taken from Sound Video by the defendants and operating funds that the defendants failed to transfer to Sound Video. The plaintiffs have alleged injury stemming from alleged RICO violations and the defendants have failed to demonstrate the absence of a genuine issue of material fact regarding the RICO injury. Accordingly, the defendants' summary judgment motion, to the extent it relies on a failure to establish injury, must be denied.

### 4. Standing

■ The defendants argue that summary judgment must be granted against plaintiff Electratainment because Electratainment lacks standing to sue under RICO for injury inflicted on Sound Video. As a general rule,[11] shareholders cannot bring a RICO action in their individual capacity to redress injuries inflicted upon their corporation. *See Rand v. Anaconda–Ericcson, Inc.*, 794 F.2d 843, 849 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed. 2d 582 (1986); *Warren v. Manufacturers Nat'l Bank*, 759 F.2d 542, 544 (6th Cir. 1985); *Nordberg v. Lord, Day & Lord*, 107 F.R.D. 692, 699 (S.D.N.Y.1985). This is so even when the plaintiff is the sole shareholder of the injured corporation. *Green v. Victor Talking Machine Co.*, 24 F.2d 378, 380–81 (2d Cir.1928) ("Even when all the stock is owned by a sole shareholder, there seems no adequate reason to depart from the general rule that the corporation and its shareholders are to be treated as distinct legal persons."); *Sirinakis v. Colonial Bank*, 600 F.Supp. 946, 953 n. 10 (S.D.N. Y.1984) (president and principal shareholder of shipping company could not claim companies tort and contract damages as his own). An exception to the general rule exists when the injury creates not only a cause of action in favor of the corporation but also a cause of action in favor of a shareholder, as an individual, for violation of a duty owed directly to him. *See Henry*

---

11. In formulating a rule of law for RICO standing, in the absence of authority in the RICO context, we are guided by basic principles of the law of corporations. *See Warren v. Manufacturers Nat'l Bank*, 759 F.2d 542, 545 (6th Cir. 1985).

*v. General Motors Corp.*, 236 F.Supp. 854, 857 (N.D.N.Y.), *aff'd*, 339 F.2d 887 (2d Cir. 1964); *General Rubber Co. v. Benedict*, 215 N.Y. 18, 21, 109 N.E. 96 (1915).

In *General Rubber*, a case heavily relied on by the plaintiffs, the New York Court of Appeals was faced with a factual situation nearly identical to the one presented herein. The plaintiff corporation was the holding company of a wholly-owned subsidiary corporation. The defendant, who was not a director in the subsidiary corporation but was a director of the plaintiff corporation injured the plaintiff by causing the value of the plaintiffs' shares in the subsidiary company to decrease. Judge Cardozo held that because the defendant was a director of the parent company and not the subsidiary company, "he owed to the plaintiff the duty of good faith and vigilance in the preservation of its property. The duty and the breach, coupled, it is here alleged, with damage, make out a cause of action." *General Rubber Co. v. Benedict*, 215 N.Y. 18, 21, 109 N.E. 96 (1915). Thus, the court held that the parent's cause of action for breach of fiduciary duty and the subsidiary's cause of action for conversion of assets were distinct and independent claims. "[T]he wrong to the plaintiff does not cease to be remediable because it may also be a wrong to some one else. If the defendant has violated any duty to the subsidiary company, it is not the same duty that he owes to the plaintiff." *Id.* at 23, 109 N.E. 96. Thus, the court concluded that, despite the argument that the defendant would be exposed to double liability, both the parent and the subsidiary were entitled to prosecute their discrete causes of action. *Id.* at 26, 109 N.E. 96. *General Rubber*, therefore, permits a parent company to sue the wrongdoer for breach of fiduciary duty, despite the fact that the subsidiary company may maintain an action against the same defendant for conversion. This rule does not, however, permit a parent and subsidiary company to assert the same cause of action against the same defendant.

■ In this case, although Sound Video and Electratainment are both plaintiffs on the claims against Video Shack, they assert but one claim for relief. As a practical matter, therefore, dismissal of Electratainment as a plaintiff on the RICO claims will have no effect on the claim for relief. We agree, however, that the exception permitting a shareholder to sue when a duty owing directly to him has been breached does not permit both the corporation and the shareholder to assert the same cause of action. Electratainment's remedy, if any, is to sue Morowitz directly for breach of his duties to Electratainment. Accordingly, the defendants' motion for summary judgment against plaintiff Electratainment on the RICO counts for lack of standing is granted.

### 5. Defendants Zwemke, Levine and Farber

■ The defendants argue that all RICO claims against defendants Arthur Zwemke ("Zwemke") and Howard Levine ("Levine") should be dismissed and all claims against Howard Farber ("Farber") should be dismissed. It is clear from the submissions of the parties that a factual dispute exists as to the involvement and liability of defendants Zwemke and Levine. The defendants contend that Zwemke and Levine had nothing to do with any alleged fraudulent scheme and that their involvement was limited to the legitimate operations of the Video Shack business. The plaintiffs, on the other hand, have alleged, *inter alia*, that Zwemke and Levine participated in meetings where Morowitz attempted to suborn Sound Video executives; Zwemke and Levine removed certain Sound Video documents and Zwemke urged bank officials that Morowitz should be in control of Sound Video. Although these facts, if true, do not present an overwhelming case of involvement in a RICO conspiracy, the plaintiffs allegations do raise a genuine issue of material fact. Accordingly, summary judgment of the RICO claims against defendants Zwemke and Levine is denied.

■ The defendants also argue that they are entitled to summary judgment on all claims alleged against Farber. By Order of this court in March 1988, the plaintiffs

**138**

voluntarily dismissed all claims against Farber except claims relating to payments misappropriated to Distribpix (a company owned by Morowitz and Farber) and an accounting for profits on certain film titles Sound Video and Video Shack jointly acquired. The defendants broadly assert that there is no evidence of Farber's role in the remaining claims. The plaintiffs, however, have offered concrete allegations of Farber's involvement in the misappropriation of Sound Video funds to Distribpix. As such, there are material issues of fact which cannot be determined on summary judgment.

### E. Breach of Fiduciary Duty [12]

The defendants move for summary judgment on the breach of fiduciary duty count of the complaint on the grounds that because there was no joint venture between Sound Video and Video Shack, there were no fiduciary obligations between the parties.

#### 1. The Pleadings

■ The defendants allege that the plaintiffs breach of fiduciary duty claim must be dismissed because there is no basis for such a claim in the pleadings. Specifically, they contend that the pleadings do not support a contention that Video Shack promised to pledge its assets for the benefit of Sound Video. The Consolidated Amended Complaint alleges that Video Shack promised to pledge its inventory as collateral to secure the combined entities' line of credit with First Chicago. Sound Video contends that at the time this promise was made, Sound Video and Video Shack were already a combined entity, or soon to be one, and that Sound Video had taken over the debt obligations of the two companies. Video Shack's promise, therefore, as acknowledged by the plaintiffs, was for the benefit of both companies and not solely for Sound Video. That the promise was for the benefit of the combined entities, however, does not eliminate the possibility that the promise gave rise to

fiduciary obligations. *See Apple Records, Inc. v. Capital Records, Inc.*, 137 A.D.2d 50, 529 N.Y.S.2d 279, 282 (1st Dept.1988) ("[L]iability in tort may arise from and be inextricably intertwined with that conduct which also constitutes a breach of contractual obligations."). Accordingly, the defendants' claim that the plaintiffs' breach of fiduciary duty claim rests on an unalleged promise to pledge collateral for the sole benefit of Sound Video is misguided. Moreover, the plaintiffs assert that their breach of fiduciary duty claim is not limited to the promise to pledge collateral. The plaintiffs further allege that the defendants misappropriated cash from Sound Video, failed to transfer operating funds to Sound Video and attempted to injure Sound Video financially to facilitate a takeover of Sound Video. As such, the defendants motion for summary judgment will not be granted on the grounds that the breach of fiduciary duty claim is not supported by the pleadings.

#### 2. The Existence of a Joint Venture

■ The defendants further contend that even if the plaintiffs are permitted to assert a breach of fiduciary duty claim, it must fail as a matter of law because the plaintiffs cannot prove the existence of a joint venture creating such a duty. A joint venture under New York law "has been variously defined as an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; [and] a combination of property, efforts, skill and judgment in a common undertaking." *United States v. Standard Oil Co.*, 155 F.Supp. 121, 148 (S.D.N.Y.1957), *aff'd*, 270 F.2d 50 (2d Cir.1959). Common indicia of a joint venture are: (1) the intent of the parties to form a joint enterprise; (2) joint control and management of the business; (3) a sharing of profits and losses; and (4) a combination of property, skill or knowledge. *See Halloran v. Ohlmeyer Communications Co.*, 618 F.Supp. 1214, 1218 (S.D.N.Y.1985). For the following reasons, we believe that a genuine issue of material

**12.** The parties have conceded that New York and Illinois law do not differ on the elements of a common law fiduciary duty claim.

fact is present as to the existence of a joint venture between Sound Video and Video Shack, giving rise to fiduciary obligations.

### a. *Intent*

The defendants contend, without great specificity, that the parties did not intend to create a joint venture. In support of this contention, the defendants direct this court to statements of Noel Gimbel suggesting that the parties did not intend to create a joint venture. The plaintiffs, on the other hand, have adduced evidence suggesting that the parties intended to join their businesses for a common purpose.[13] Moreover, the plaintiffs assert that the defendants' use of Gimbel's statement is taken out of context. They contend that answer was in response to questions about the defendants' counterclaim that the joint operation was limited to Sound Video's Dallas and Portland branches. Gimbel's answer, the plaintiffs posit, was limited to the subject of the Dallas and Portland branches. From the foregoing, it is clear that the issue of intent will rest largely on the credibility of the evidence produced by both parties.

### b. *Joint Management and Control*

This factor, as well as that of the intent of the parties, is a victim of the battle of affidavits. The defendants contend that the relationship between Sound Video and Video Shack was characterized by autonomy and separateness rather than joint management or control of the business. In support of their argument, the defendants present deposition testimony of Gimbel demonstrating that the structure of the combination involved separate control of Sound Video and Video Shack. The plaintiffs, however, offer Morowitz's affidavit and correspondence as evidence of the combination of management involved in the business consolidation. Moreover, the plaintiffs have identified a passage in Gimbel's testimony, offered by the defendants, in which Gimbel refers to Morowitz as "a

normal partner" in the operation of Sound Video.

Clearly, "the requirement of joint control and management cannot mean that each coventurer must involve himself in every detail of the venture. Surely the parties to a joint venture may choose to divide the responsibilities between themselves and defer ... to each other's different areas of expertise." *Halloran v. Ohlmeyer Communications Co.,* 618 F.Supp. 1214, 1219 (S.D.N.Y.1985). The evidence adduced by both parties create the possibility that while joining the enterprises under a common entity, the parties delegated the daily management responsibility to the person most familiar with a particular branch of the business. Thus, the plaintiffs have offered evidence of joint control sufficient to raise an issue of fact.

### c. *Sharing of Profits and Losses*

The parties have offered contradictory evidence on the issue of shared profits and losses. In support of their position, the defendants assert that the salaries of Gimbel and Morowitz were to be paid by Sound Video and Video Shack respectively. Neither individual was permitted to draw funds from the other's company. Moreover, the defendants present deposition testimony of Noel Gimbel to the effect that profits from a branch of Sound Video were to be kept by Sound Video.

The plaintiffs, not surprisingly, offer evidence to the contrary. They assert that Morowitz represented that he could make a profit as a result of the combination. They demonstrate that the operating results of Sound Video and Video Shack were reported as Electratainment's results on a consolidated statement. Moreover, they contend that the division of salary is not equivalent to the division of profits. Rather, profits and losses of the business, after payment of salaries, were to be pooled into Electratainment's operating results. Once again, the plaintiffs have adduced sufficient evidence to raise a triable issue of whether

**13.** The plaintiffs contend that statements from the defendants answer, Morowitz's September 1982 affidavit, and Gimbel's September 1982 deposition support the conclusion that the parties intended to create a joint venture.

the parties intended to share profits and losses in the business combination.

### d. *Combination of Property, Skill or Knowledge*

The defendants do not appear to dispute that the parties intended to, and did, combine their property, skill and/or knowledge. Not only did the parties combine their assets, the parties hoped to profit from the combined skill and expertise of Gimbel and Morowitz.

For the foregoing reasons, we conclude that there are genuine issues of material fact with regard to the creation of a joint venture. There are triable issues of intent, control and sharing of profits and losses. Accordingly, the presence or absence of a joint venture cannot be determined on summary judgment.

### 3. Cessation of Joint Venture

Assuming, *arguendo*, that Sound Video and Video Shack entered into a joint venture, the defendants argue that they ceased being joint venturers when they conducted their business through the corporate form of Electratainment. In support of their position, the defendants cite the New York Court of Appeals case of *Weisman v. Awnair Corp.*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957). *Weisman* stands for the proposition that a joint venture may not be carried on in the corporate form. Once a corporation has been formed, the parties " 'cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world.' " *Id.* at 449, 165 N.Y.S.2d at 750 (quoting *Jackson v. Hooper*, 76 N.J.Eq. 592, 75 A. 568 (1910)).

The scope of *Weisman*, however, has been severely limited by subsequent New York and Illinois cases. As the law stands now, courts in New York will permit suit on joint venture obligations "if it is apparent that the intention of the parties was that the corporation should be only a means of carrying out the joint venture—a

conduit of title ... or a way of organizing different branches of a wide-reaching joint enterprise...." *Arditi v. Dubitzky*, 354 F.2d 483, 487 (2d Cir.1965). Similarly, as stated in *Sagamore Corp. v. Diamond West Energy Corp.*, 806 F.2d 373 (2d Cir. 1986),

> [W]hen the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights *inter sese* under the agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced.

*Id.* at 378.

■ The Illinois Appellate Court has adopted the New York approach to this issue. Relying, *inter alia*, on the Second Circuit's decision in *Arditi*, the Illinois Appellate Court has stated that "Illinois courts have long held that substance and not form should be the controlling criterion in determining the nature of a business relationship." *Koestner v. Wease & Koestner Jewelers, Inc.*, 63 Ill.App.3d 1047, 21 Ill.Dec. 76, 79, 381 N.E.2d 11, 14 (1978). Thus, the court held that "[t]he parties intended the business to be run on a 50/50 basis notwithstanding its incorporation. The corporate form was used merely as a medium for carrying out the partnership purposes...." *Id.* See also *Tilley v. Shippee*, 12 Ill.2d 616, 147 N.E.2d 347 (1958) ("[The parties'] decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual duties and obligations were similar to those of partners.").[14] Thus, we are again faced with the question of the intent of the parties in merging their consolidated business into the corporate form of Electratainment. Whether the joint ven-

---

**14.** To the extent that New York and Illinois law differ on this issue, we have earlier determined that Illinois law will apply. It appears, how-

ever, that the state of the law in Illinois largely mirrors that in New York with regard to the merger of a joint venture into a corporation.

ture agreement, if it is determined to exist, was incorporated and merged into the corporate form is a factual question that must await trial for determination. *See Arditi v. Dubitzky*, 354 F.2d 483, 487 (2d Cir.1965) ("Plaintiff and defendant alike should have an opportunity to present such facts as they may be able to adduce [on the issue of whether joint venture merged into corporation]."). Accordingly, defendants motion for summary judgment on the plaintiffs' breach of fiduciary duty claim is denied in its entirety.

### F. *Lost Profits*

The defendants argue that the plaintiffs' claims for lost profits on their fraud, conversion, breach of contract, breach of fiduciary duty, securities fraud and RICO actions must be dismissed.

#### 1. Fraud

■ The defendants correctly contend that lost profits are not recoverable under New York's common law fraud action. Having already determined that Illinois law applies to the substantive issues of the common law claims, however, we are guided by Illinois law of damages. Illinois law permits recovery of lost damages for fraud. *See Four "S" Alliance v. Amer. Nat'l Bank & Trust Co.*, 104 Ill.App.3d 636, 60 Ill.Dec. 314, 317, 432 N.E.2d 1213, 1216 (1982); *ABC Trans Nat'l Transport v. Aeronautics Forwarders*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 199, 413 N.E.2d 1299, 1312 (1980). Accordingly, defendants' motion for summary judgment on the lost profits element of plaintiffs' common law fraud claim is denied.

#### 2. Conversion

■ Both the defendants and the plaintiffs cite to New York authority on this issue so we will assume that New York and Illinois law are the same. The defendants argue that lost profits are generally disallowed in conversion actions and that the general measure of damages is the value of

the converted property at the time and place of conversion, plus interest. *See Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 786, 402 N.E.2d 122, 125 (1980). Lost profits may be recovered, however, if they "may reasonably be expected to follow from the conversion." *Id.* We agree with the plaintiffs that any question of the reasonable expectations of the parties is a fact question reserved for the jury. The defendants' motion to dismiss the lost profits claim for the conversion count is, therefore, denied.

#### 3. Breach of Contract

■ The defendants contend that lost profits are not recoverable on the plaintiffs' breach of contract claim because that claim is governed by the Uniform Commercial Code ("UCC") which disallows lost profits as a measure of damages. UCC § 2–709 controls an action by the seller when the buyer fails to pay the price as it becomes due. Under this section, the seller is limited in remedy to the price of good accepted.[15] In the absence of opposition from the plaintiffs, we agree with the defendants that this claim is grounded in the UCC and is, therefore, limited in remedy to the price of goods accepted. Accordingly, the plaintiffs' claim for lost profits for breach of contract is dismissed.

#### 4. Breach of Fiduciary Duty

■ The defendants claim that the plaintiffs may not recover lost profits for breach of fiduciary duty because they cannot prove the existence of a fiduciary obligation running from the defendants to the plaintiffs. Having already determined that the plaintiffs have established the existence of factual questions on this issue, we cannot say, as a matter of law, that the plaintiffs may not recover lost profits. Both New York and Illinois law have permitted recovery of lost profits for breach of fiduciary duty. *See, e.g., S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 851–52 (2d

---

15. UCC § 2–708, which permits recovery of lost profits, applies only to those situations where the buyer has rejected the goods or repudiated the contract. In this case, plaintiffs allege that

Video Shack failed to pay for goods received from Sound Video. Accordingly, their breach of contract action properly falls within UCC § 2–709.

Cir.1987); *Ray v. Winter,* 67 Ill.2d 296, 307, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977). Defendants' motion for summary judgment, therefore, is denied on the issue of lost profits recovery for breach of fiduciary duty.

### 5. Securities Fraud

■ Under the Securities Exchange Act of 1934, recovery in securities fraud actions is limited to "actual damages." 15 U.S.C. § 78bb(a) (1981); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 939–40 (2d Cir.1984), *cert. granted and vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986); *Quintel Corp. v. Citibank, N.A.,* 596 F.Supp. 797, 802 (S.D.N.Y.1984). Actual damages consist of "out-of-pocket losses, defined as the excess of what [was] paid over the actual value of what [was] received." *Quintel Corp. v. Citibank, N.A.,* 596 F.Supp. 797, 802 (S.D.N.Y.1984). The plaintiffs have not opposed the defendants' position that lost profits are disallowed under the Securities Exchange Act. Accordingly, we will follow the weight of authority in this circuit and grant defendant's motion to dismiss the plaintiffs' claim for lost profits on their federal securities actions.

### 6. RICO

■ The defendants' final argument is that the plaintiffs may not recover lost profits under RICO. This issue has not been addressed by this circuit. We rely, therefore, on authority from other federal district courts. In *Dement v. Abbot Capital Corp.,* 589 F.Supp. 1378 (N.D.Ill.1984), a decision we find controlling, the court held that

> [i]f the 'damages sustained' by a victim of a RICO violation include lost profits, we see no bar in the statute to recovery of those losses. Of course, recovery of

lost profits should be subject to the ordinary limitations concerning remoteness (or proximate cause) and speculativeness (or certainty), but on the present record we cannot say that the damages sought here are so remote from the wrongdoing or speculative and uncertain that they are unrecoverable as a matter of law. It will, of course, be up to plaintiffs to prove at trial their entitlement to damages.

*Id.* at 1386. *See also Anderson–Myers Co. v. Roach,* 660 F.Supp. 106, 113 (D.Kan. 1987).[16] We will follow the path carved by the Northern District of Illinois and deny the defendants' motion to dismiss the lost profits claim on the plaintiffs' RICO causes of action.

### G. Conclusion

For all of the reasons above stated, the defendants' motion for summary judgment is granted in part and denied in part.

### III. COUNTERDEFENDANT LEE GIMBEL'S MOTION FOR SUMMARY JUDGMENT

Lee Gimbel is an additional defendant, along with Noel Gimbel and Sound Video, on defendants' First, Eighth and Tenth Counterclaims alleging fraud, rescission, and RICO. Lee Gimbel moves herein for summary judgment dismissing the claims against him in their entirety.[17] For the foregoing reasons, we grant counterdefendant's motion in part and deny it in part.

The defendants' allegations against Lee Gimbel are threefold. First, the defendants allege that Lee Gimbel made affirmative misrepresentations to the defendants by virtue of his "execution" of the Reorganization Agreement (the "Agreement") entered into by Sound Video and Video Shack. Second, Lee Gimbel is alleged to have committed fraud upon the defendants by his nondisclosure of material facts regarding

---

**16.** The defendants' contend that these decisions held that lost profits were recoverable because lost profits were recoverable for the predicate acts in those jurisdictions. Without reaching the merits of the defendants' argument, we note that Illinois law permits lost profits recovery for

the plaintiffs' predicate acts. Having previously decided that Illinois law applies in this case, defendants' argument is misplaced.

**17.** The standard for summary judgment is delineated *supra.*

Noel Gimbel's personal borrowings and his alleged self-dealing with Sound Video customers. Third, the defendants contend that Lee Gimbel has continued to perpetrate a fraud on the defendants by virtue of the prosecution of claims he knew to be false—namely the primary action in the Sound Video/Video Shack litigation.

On his motion for summary judgment, Lee Gimbel claims, first, that he did not "execute" the Agreement and cannot be held liable for representations made within it. The signature page of the Agreement demonstrates that, on the right hand side of the page, Noel Gimbel signed as President of Electratainment and Arthur Morowitz and Howard Farber signed as "Company Shareholders." Lee Gimbel's signature, however, appears on the left hand side of the page under the heading "Attest:" and with the title "Secretary" under the signature line. Lee Gimbel asserts, therefore, that he signed as an attesting witness and made no representations as to the content of the document.

 The face of the document clearly demonstrates that Lee Gimbel was an attesting witness. His signature is apart from the executing signatures and follows an express statement that he is attesting to the signatures on the document. There is no indication that he signed in any other capacity. The defendants have offered no evidence suggesting that Lee Gimbel was a party to the Agreement.[18] Their bare assertions that Lee Gimbel "executed" the Agreement are insufficient to raise a genuine issue of material fact.

 Lee Gimbel next argues that the defendants have failed to prove the existence of a genuine issue of material fact as to Lee Gimbel's alleged nondisclosures. A *sine qua non* of an action for nondisclosure is that the alleged wrongdoer had knowledge of the facts which he failed to disclose. *See Peerless Mills, Inc. v. Amer-*

*ican Tel. & Tel. Co.*, 527 F.2d 445, 449 (2d Cir.1975). The defendants have failed to offer any evidence that Lee Gimbel was aware of Noel Gimbel's personal borrowings. Absent proof of knowledge, there can be no liability for nondisclosure. Accordingly, the defendants have failed to raise a genuine issue of material fact on this issue.

The defendants also charge Lee Gimbel with a fraudulent failure to disclose his family's ownership of Independent Records, a retailer which was allegedly represented to defendants to be owned by Sound Video. In his motion for summary judgment, Lee Gimbel presents the July 24, 1985 deposition testimony of Arthur Morowitz to prove that Morowitz knew that Noel Gimbel had an interest in Independent Records. In opposition to the motion, the defendants present an affidavit of Arthur Morowitz stating that he did not know that Independent Records was owned by the Noel Gimbel and his family. It was his understanding that Independent Records was owned by Sound Video and would become a joint asset upon the consolidation of Sound Video and Video Shack.

 The conflict in Morowitz's testimony can only be resolved through the credibility determination of a jury. Whether Morowitz understood Independent Records to be owned by Gimbel *qua* Sound Video or Gimbel's family is a fact issue that cannot be determined on summary judgment.

 Lee Gimbel also moves for summary judgment on the defendants' claim that he has perpetrated a fraud through the prosecution of the Sound Video litigation. Lee Gimbel is not a plaintiff in the primary litigation between Sound Video and Video Shack. He is a party to this action only as a defendant on the defendants' counterclaims. Accordingly, he cannot be held liable for a *quasi* malicious prosecution claim.

---

**18.** The defendants also suggest that Lee Gimbel's signature on the Stockholder Agreement, which was incorporated by reference into the Reorganization Agreement, imposes liability upon him for representations in the Reorganization Agreement. This argument puts the cart before the horse. The Stockholder Agreement does not contain any of the allegedly misleading statements. Perhaps if the Stockholder Agreement incorporated the Reorganization Agreement the defendants might be able to formulate an argument for liability. That not being the case, however, the defendants' argument fails.

For the foregoing reasons, the defendants counterclaims against Lee Gimbel are dismissed except their claim that Lee Gimbel failed to disclose his family's ownership of Independent Records.

## IV. PLAINTIFFS' AND ADDITIONAL DEFENDANTS ON THE COUNTERCLAIMS' MOTION TO DISMISS COUNTERCLAIMANTS' DAMAGE CLAIM "R"

The plaintiffs and additional defendants on the counterclaims (collectively referred to for the purposes of this motion as the "plaintiffs") have moved to dismiss defendants' damage claim "R" with prejudice. Claim "R" raised a claim for $409,318.24 for the transfer to Sound Video of Video Shack inventory on or about December 31, 1981 for less than the agreed price and reasonable value. On November 5, 1986, during the course of discovery, counsel to Video Shack announced at a deposition that the defendants would no longer be pursuing the claim set forth in schedule R. On January 19, 1987, defendants' counsel presented to plaintiffs' counsel a "workpaper" by Touche Ross, the defendants' examining expert, which stated that "CLAIM R HAS BEEN WITHDRAWN." The expert testified at his deposition that all work had ceased on claim R because the claim had been withdrawn. Subsequent to these statements, all discovery on claim R was stopped. Despite these representations that the claim was no longer being pursued, the defendants refused to sign a stipulation stating that they would not seek to recover damages as set forth in claim R. The plaintiffs have now moved for an order dismissing the claim with prejudice.

The defendants do not dispute the facts as set forth in the foregoing paragraph. Nonetheless, they oppose the plaintiffs' motion on the ground that, by their motion, the plaintiffs seek to preclude defendants from offering proof in rebuttal of the plaintiffs' claim for damages resulting from the same transaction that was the subject of claim R. The defendants contend that they withdrew only the calculation of damages in claim R. While they were willing to stipulate to a withdrawal of the damage calculation in claim R, they were not willing to withdraw all claims relating to the subject matter of claim R.

■ It is clear, however, that as communicated to the plaintiffs' counsel, "the defendants will not be pursuing the claim set forth in schedule R to recover damages for that claim in this case." (Deposition of Alan Friedman, Counterdefendants' Memorandum in Support, Ex.D. p. 704–05). Accordingly, we grant the plaintiffs' motion to dismiss with prejudice any attempt by the defendants to recover damages on the claim set forth in claim R. Defendants are not, however, precluded from offering proof to rebut any claim by the plaintiffs on matters related to claim R.

## V. PLAINTIFFS' AND ADDITIONAL DEFENDANTS ON THE COUNTERCLAIMS' MOTION FOR A SEPARATE TRIAL OF THE WIRETAP COUNTERCLAIMS

The plaintiffs and additional defendants on the counterclaims (collectively referred to for the purposes of this motion as the "plaintiffs") have moved pursuant to Fed. R.Civ.P. 42(b) for a separate trial of Morowitz and Zwemke's Fifteenth through Twentieth Counterclaims (the "wiretap counterclaims") against Noel Gimbel. In those counterclaims, Morowitz and Zwemke allege that Noel Gimbel violated Title III of the Omnibus Crime Control and Safe Streets Act by tapping a Sound Video office telephone used by Zwemke and by disclosing and using taped and transcribed conversations. The plaintiffs so move on the grounds that the wiretap counterclaims are significantly different from the other issues in the case and because the wiretap counterclaims are to be tried to the court while the primary action will be tried before a jury.

The defendants contend that severance is inappropriate because the wiretap counterclaims will be tried by the jury. In support of their argument, the defendants assert that they are entitled to rely on the plain-

tiffs' general demand for a jury trial. We turn, therefore, to Fed.R.Civ.P. 38(c).[19]

Rule 38(c) provides that "[i]n his demand [for a jury trial] a party may specify the issues which he wishes so tried; otherwise he shall be deemed to have demanded trial by jury for all the issue so triable." The provision for "all issues so triable" has been limited by this circuit to mean those issues with which the demander is connected. *See Rosen v. Dick*, 639 F.2d 82, 91 (2d Cir.1980) (general jury demand "does not mean that any jury demand ensures a jury trial for every issue regardless of the demander's connection with it"). Thus, a party who demands a jury trial does not so demand for issues raised later with which he is unconnected. In an attempt to clarify this point of law, Professor Moore set forth the following example:

> [I]f the demand does not pertain to certain issues then one of the parties concerned with those issues should make demand therefor. Thus assume that A sues X; X answers and also files a third-party complaint against Y. If A makes a timely general demand the demand embraces all the issues between A and X, and X may rely thereon and need not make a demand for those issues. It is rather strained, however, to say that A's general demand embraces the third-party issues between X and Y, with which A is not concerned. And it would seem that either X or Y should make a timely demand as to the third-party issues if a jury trial is desired as to those issues.

5 Moore's Federal Practice, ¶ 38.45, at 38–391 to 38–392 n. 2 (1988). Accordingly, Sound Video's jury demand that was affixed to its complaint did not encompass the wiretap counterclaims later asserted by Morowitz and Zwemke. Although the plaintiffs "are surely 'concerned' with the third-party issues which have arisen, ... those issues were not part of the case at the time [they] demanded a jury trial...." *Rosen v. Dick*, 639 F.2d 82, 92 (2d Cir. 1980).[20]

■ The defendants further assert that the wiretap counterclaims are not new issues outside the scope of plaintiffs' general jury demand. *See Rosen v. Dick*, 639 F.2d 82, 94 (2d Cir.1980). We disagree. The counterclaims do not merely introduce a new theory of recovery. Nor are the wiretap issues dependent upon factual conclusions common to those in the primary case. *See id.* The wiretap counterclaims raise new factual questions that are not germane to the primary lawsuit. Accordingly, we hold that the counterclaim raises new issues outside the scope of the plaintiffs' jury demand and as to which a jury trial has been waived for failure to comply with Rule 38(b).[21]

Fed.R.Civ.P. 39(b) provides that "notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury on any or all issues." The defendants argue that exercise of this discretion is appropriate here.

There can be no question but that the right to a trial by jury is fundamental to our system of justice. *See Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811–12, 81 L.Ed. 1177 (1937). This is not a case, however, where the interests of justice are served by forgiving a waiver of the jury trial right. Rather, there are many factors counseling against the exercise of discretion in this case. The issues involved in the wiretap counterclaims, as previously stated, are separate and distinct from those

**19.** In response to the plaintiffs' motion, the defendants have made a cross-motion for a jury trial of the wiretap counterclaims. We consider that motion in conjunction with the plaintiffs' motion herein.

**20.** The defendants contend that because Gimbel owned 90% of the stock of Sound Video, he is "affected" by the jury demand and therefore the defendants are entitled to rely on Sound Video's jury demand. As stated in *Rosen*, reliance is limited to those parties who are affected by the demand. *Rosen v. Dick*, 639 F.2d 82, 92 (2d Cir.1980). Even assuming that Gimbel is affected by Sound Video's jury demand, that does not give Morowitz and Zwemke a right to so rely.

**21.** Fed.R.Civ.P. 38(b) requires that a party demand a trial by jury "not later than 10 days after the service of the last pleading directed to such issue."

raised in the primary lawsuit. Presentation of the wiretap charges to the jury in an already overly complex commercial dispute will needlessly confuse and misdirect the jury from the central issues of the case. Moreover inclusion of the wiretap counterclaims in the jury trial of Sound Video's lawsuit creates the great possibility that the jury will be unfairly prejudiced by reference to unlawful activity by people associated with Sound Video. *Cf. By–Prod Corp. v. Armen–Berry Co.*, 668 F.2d 956, 960 (7th Cir.1982) ("Because of the confusing Watergate aura that the [wiretap] counterclaim would have cast over the antitrust suit if tried with it, the district judge would ... have ordered separate trials on the main suit and on the counterclaim...."). For the foregoing reasons, therefore, we decline to excuse the defendants' failure to make a demand for a jury trial on the wiretap counterclaims. Those claims will be tried to the court. Accordingly, defendants' cross-motion for a jury trial on the wiretap counterclaims is denied.

■ Rule 42(b) rests discretion in the court to order separate trials of claims "in furtherance of convenience or to avoid prejudice." In determining under Rule 42(b) whether to sever the wiretap counterclaims from the case, the two primary determinations to be made are (1) whether the claims sought to be severed are "significantly different" from the other issues; and (2) whether the issues are "triable by jury or the court." *See Reading Indus., Inc. v. Kennecott Copper Corp.*, 61 F.R.D. 662, 664 (S.D.N.Y.1974).

The wiretap claims are asserted against Noel Gimbel—not against Sound Video. Rather than going to the allegedly fraudulent dealing and aborted merger between Sound Video and Video Shack, these claims seek damages for the independent, unlawful conduct of Noel Gimbel. Moreover, the issues of the primary lawsuit will be tried to the jury and the wiretap issues, as discussed above, will be tried to the court. Accordingly, this is an appropriate case for severance.

The decision to sever the wiretap counterclaims is made stronger by the threat of undue prejudice to the plaintiffs by the "spillover effect" from the wiretapping charges against Gimbel. The defendants contend that there can be no prejudice to Sound Video and Electratainment by association with Noel Gimbel because Gimbel was the principle shareholder of the corporations. This argument is unpersuasive. Noel Gimbel is not a party to the litigation between Sound Video, Electratainment and Video Shack. The wiretap claims were not asserted against Sound Video or Electratainment. As such, introduction of unlawful activity by Noel Gimbel, a non-party to the primary action, creates a threat of undue prejudice to Sound Video for its association with Noel Gimbel.

Severance is also appropriate in this case because of the "[s]ubstantial trial disruption [that] would result from the necessity for continuous [limiting] instructions to the jury." *Ropfogel v. Wise*, 112 F.R.D. 414, 416 (S.D.N.Y.1986). Moreover, there is a great danger of confusion of the issues by the jury, especially since the wiretap issues will be tried to the court. *Id.*

In conclusion, we find that the sensitive issues in the wiretap counterclaims are most appropriately tried in a separate proceeding before the court. Jury trial has been waived as to those claims and there are significant factors counseling towards severing the counterclaims from the primary lawsuit. Accordingly, plaintiffs motion for a separate trial is granted.

### VI. DEFENDANTS' MOTION IN LIMINE

The defendants have moved for an *in limine* order precluding reference by the plaintiffs to: (1) any alleged joint venture agreement or promise on the part of Video Shack or Morowitz to pledge the assets of Video Shack as collateral to support existing loans of Sound Video or as collateral for a combined entities line of credit; (2) any alleged joint venture agreement or promise on the part of Video Shack or Morowitz to permit Gimbel to retain control of Sound Video; (3) any personal knowledge of Zwemke concerning the financial condition of Sound Video as a basis for

imputing knowledge to Video Shack or Morowitz solely on the basis of access and regular communications between such parties, absent proof of actual affirmative verbal or written disclosures of such information to Video Shack or Morowitz; (4) any alleged scheme on the part of Video Shack to commit tax fraud; (5) any claim for lost profits based on calculations, workpapers and/or materials not furnished to defendants by the cutoff date of August 8, 1988; (6) any additional new theories, schemes, factual assertions or other matters or things not already set forth in the Pre–Trial Order; and (7) any additional new theories, schemes, factual assertions or other matters or things precluded by earlier orders of this court. We address each one in turn.

### A. *Reference to Joint Venture or Fiduciary Obligations*

 Disposition of the defendants' *in limine* motion on this point is largely governed by our determination of their summary judgment motion. We have already determined that the plaintiffs have demonstrated the existence of a genuine issue of material fact regarding the existence of a joint venture between Sound Video and Video Shack. Similarly, we have decided that the plaintiffs have raised a triable issue of fact as to whether the defendants breached a fiduciary duty to the plaintiffs. Accordingly, it follows that the plaintiffs are entitled to, and indeed must, refer to the alleged joint venture and other fiduciary obligations at trial. The defendants have used their *in limine* motion as a tool for regurgitating their summary judgment motion. Having already determined that the plaintiffs are entitled to present their claims of breach of fiduciary duty to the jury, we will not permit the defendants to send them into the courtroom unarmed. Accordingly, the defendants' motion to pre-clude any and all references to the alleged joint venture and alleged promises made to Sound Video by Morowitz or Video Shack is denied.[22]

### B. *Imputation of Knowledge*

The defendants seek to preclude the plaintiffs from attempting to impute knowledge of Sound Video's financial condition to Video Shack on the theory that Morowitz had free access to Sound Video's financial data through its Chief Financial Officer, Arthur Zwemke. In defense of the counterclaims asserted against them, the plaintiffs seek to prove that Morowitz had access to knowledge of Sound Video's financial situation and may have had personal knowledge of those facts such that there could be no reasonable reliance on the plaintiffs' alleged misrepresentations. In support of their defense, they seek to introduce evidence that Zwemke had frequent, lengthy telephone conversations with Morowitz, outside of Gimbel's presence and outside normal business hours. They also seek to demonstrate that Zwemke travelled to New York to meet with Morowitz on more than one occasion.

 The defendants assert, by way of Zwemke's 1987 affidavit testimony, that Zwemke never gave Morowitz any adverse information about Sound Video. To the contrary, the plaintiffs offer Zwemke's 1982 deposition testimony suggesting that Zwemke discussed Sound Video's financial "plight" with Morowitz. The jury is entitled to assess the credibility of Zwemke's testimony and to determine whether Morowitz was entitled to rely on Gimbel's assertions of Sound Video's financial status. Any question of whether the jury may impute Zwemke's knowledge to Morowitz is a matter for jury instructions, not pretrial exclusion of evidence. The plaintiffs' proffered evidence of contacts be-

---

**22.** The defendants contend that any reference to a promise to pledge collateral must be precluded because such a promise must be evidenced by a writing under the Statute of Frauds as a promise to answer for the debt of another. N.Y.Gen.Oblig.L. § 5–701(a)(2); Ill.Rev.Stat. ch. 59, ¶ 1. This argument fails because a failure to plead the Statute of Frauds as a defense results in "the waiver of that defense and its exclusion from the case." *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (failure to plead affirmative defense results in waiver); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278 at 339–341 (1969) (same); *see also* Fed.R.Civ.P. 8(c) (statute of frauds is an affirmative defense).

**148**

tween Zwemke and Morowitz is relevant and germane to their defense. It is admissible evidence that we will not exclude. Accordingly, the defendants' motion is denied.

## C. *Alleged Tax Fraud*

 The defendants have moved *in limine* to preclude the plaintiffs from referring at trial to any alleged tax fraud scheme perpetrated by the defendants. The plaintiffs assert that the defendants overstated Video Shack purchases from Sound Video by millions of dollars in an attempt to understate its tax liability. The plaintiffs contend that Video Shack's controller sent a false statement of operations to Sound Video and to Sound Video's bank, thereby injuring Sound Video's credit relationship and breaching Video Shack's fiduciary duties. We can see no reason why evidence of falsified records should be excluded from the jury. It is relevant evidence of the alleged fraud perpetrated by Video Shack on Sound Video.

 Evidence of Video Shack's alleged tax fraud is another story. The plaintiffs were not injured by any tax fraud. They claim that proof of Video Shack's fraudulent tax scheme is relevant to proving a continuing RICO enterprise. The Consolidated Amended Complaint, however, is devoid of reference to tax fraud by the defendants. Moreover, introduction of such evidence to the jury poses the threat of unfair prejudice to the defendants from a claim that is not part of the litigation. Accordingly, we grant the defendants' motion with the qualification that the plaintiffs are in no way barred from offering evidence of alleged falsified records. The plaintiffs are, however, precluded from referring to or presenting evidence of the alleged tax fraud scheme by the defendants.

## D. *Lost Profits Calculations*

The defendants have moved to exclude lost profits calculations included in the plaintiffs Pretrial Order on the ground that they are barred by an Order of this court precluding damage assessments based on materials produced after August 8, 1986. By Order on April 6, 1987, this court held that "the plaintiffs are hereby precluded from asserting in this action or offering into evidence at trial: a) a claim for lost profits which is based upon expert work papers produced to defendants after August 8, 1986 ... (except for arithmetical corrections)."

 The defendants contend that the plaintiffs should be precluded from asserting a claim for lost profits for the period of April 1, 1986 to July 31, 1986 because these damage figures were not presented to the defendants before August 8, 1986. The plaintiffs claim, however, that the defendants knew before the August 8, 1986 deadline that the plaintiffs' damage calculations would have to be updated when the operating results for the period in question became available.[23] Indeed, the defendants' attorney acknowledged in a July 1987 affidavit that "plaintiffs claim lost profits for the period 1982 to the date of Grace's acquisition. According to Grace the Appraisal analyzed Sound Video's operation as of the date of Grace's acquisition, August 20, 1986." (Reply Aff. of James A. Janowitz, July 8, 1987). Thus, we hold that the plaintiffs are not precluded from asserting damage figures for the period of April 1, 1986 to July 31, 1986. It is not a new theory of damages. Rather, it is an arithmetical update of an existing damage claim.

The defendants argue that the plaintiffs have asserted a lost profits assessment in the Pretrial Order that greatly exceeds any prior calculation. Specifically, the plaintiffs claim lost profits in the amount of $19,441,980 in contrast to their original calculation of $9,720,845. The plaintiffs point out that the former figure is the lost profits claim before provision for income tax whereas the latter is the post-tax calcula-

---

**23.** The plaintiffs assert that the original damages workpapers covered only the period through March 31, 1986 because the Sound Video operating results reflecting damages to the end of the damage period—July 31, 1986—were not available in August 1986 when the original workpapers were produced.

tion. The issue of whether the defendants may be held liable for pre- or post-tax loss profits calculations is one that is more appropriately dealt with as a matter of jury instructions. Accordingly, the plaintiffs' pre-tax lost profits calculations will not be precluded.

Finally, we decline to preclude the plaintiffs' lost profits calculations on the grounds that they are theoretically and arithmetically flawed. The plaintiffs are entitled to offer proof of their claimed lost profits at trial. The calculations presented in the Pretrial Order were subjected to extensive discovery by the defendants. The trier of fact is entitled to reject the plaintiffs' claim for lost profits. However, we will not here state that the plaintiffs are barred from even presenting such evidence to the jury. Accordingly, the defendants' motion to preclude plaintiffs' lost profits calculations is denied.

## VII. PLAINTIFFS' MOTION IN LIMINE

In the ongoing tennis tournament of this case, the plaintiffs have made their own *in limine* motion urging preclusion of: (1) a new claim for relief based on the allegation that plaintiffs' have baselessly prosecuted this case; (2) an additional $3,500,000 in new counterclaim damages; (3) a new claim for four years of post-August 1982 profits from Sound Video's Dallas and Portland branches; (4) a new $135,265 damage claim for shipment of unpaid product; (5) a new statute of frauds defense; and (6) new rescission counterclaims. The defendants, not surprisingly, vigorously contest the plaintiffs' motion.

### A. *Baseless Litigation Claim and Claim for $3,500,000*

■ The plaintiffs contend that the defendants are barred from now asserting a claim for "baseless litigation." They further assert that the defendants are precluded from claiming new damages in the

amount of $3,500,000. The defendants have countered that they are not asserting a new claim for baseless litigation. Rather, they are asserting a claim for attorney's fees in the amount of $3,500,000 because of the plaintiffs' baseless prosecution of this litigation. Such a claim is inappropriate at this juncture. If the defendants believe that they are entitled to have the plaintiffs sanctioned pursuant to Fed.R.Civ.P. 11 upon conclusion of this litigation they may so move at that time. Such a claim, however, is not properly interposed as a counterclaim in the litigation. "[T]he sanctions under Rule 11 normally will be determined at the end of litigation." Fed.R.Civ.P. advisory committee's note. We believe that the defendants' claim for attorney's fees is premature. Accordingly, the defendants are barred from asserting a counterclaim for $3,500,000 in attorney's fees based on the plaintiffs' allegedly baseless prosecution of this litigation.[24]

### B. *Extended Lost Profits Period*

■ The plaintiffs contend that the defendants are precluded from asserting a claim for lost profits of the Dallas and Portland branches of Sound Video for the period of August 1982 to August 1986. The plaintiffs argue that Video Shack has continually stated their claimed period of damages to run from October 1981 through August 1982. The defendants' claim in their Pretrial Order for lost profits through August 1986, therefore, must be precluded. The defendants counter this argument by asserting that because the plaintiffs have claimed lost profits through August 1986, they too are entitled to seek lost profits for the same time period. The defendants contend that their expanded damage claim is a response to the plaintiffs' allegedly unpleaded joint venture theories. Having already determined that there is a basis in the pleadings for the plaintiffs' claims, the defendants' argument fails. Moreover, the defendants' suggestion that this court should engage in a game of judicial tit-for-

---

24. We do not hold that the defendants are barred from offering proof at trial that the plaintiffs may have been aware of weaknesses in their case. Such evidence may be used in defense of the plaintiffs' claims. It may not, however, form the basis of a claim for attorney's fees.

tat is offensive. We will not stoop to the level of the parties' childish bickering. The defendants have heretofore established their lost profits period as running through August 1982. They may not now expand their claim by four years simply because the plaintiffs have claimed damages for that period. Accordingly, the plaintiffs' motion to preclude a claim for damages running through August 1986 is granted.

## C. *Shipment of Unpaid Product*

The plaintiffs further move for preclusion of Video Shack's claim for $135,265 for shipment of unpaid product during September 1981. The plaintiffs claim that during discovery, the amount of this claim was always $83,240 and, therefore, any attempt to enlarge the amount after the close of discovery must be barred. The defendants contend that prior to the August 8, 1986 close of discovery, the defendants subpoenaed records from Bell & Howell, A & H's video duplicator. On August 13, 1986, Bell & Howell sent to both plaintiffs' and defendants' counsel copies of shipping records that evidence a shipment of 3,250 copies of the "Story of O" video cassette. The cost of these items, at $41.62 each, amounts to the defendants' claim for $135,-265.

■ This appears to us to be an arithmetic computation of damage claims made known to the plaintiffs during discovery. Although the shipping records were not made available to the plaintiffs until 5 days after the discovery cut-off, we hold that the damage claim may properly be asserted at this time. Accordingly, the plaintiffs' motion is denied.

## D. *Statute of Frauds Defense and Rescission Counterclaims*

■ The plaintiffs contend that certain defenses raised for the first time in the defendants' Pretrial Order must be precluded. In their Pretrial Order, the defendants allege for the first time that the plaintiffs' joint venture claim and Video Shack's promise to pledge collateral are barred by the statute of frauds. The statute of frauds is an affirmative defense that must be raised in the answer or is waived. *See* Fed.R.Civ.P. 8(c); *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir.1984); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278 at 339–341 (1969). Because the defendants failed to raise the statute of frauds as a defense in their answer, they may not do so now.[25]

■ The plaintiffs also object to new claims for rescission raised by the defendants in their Pretrial Order. The defendants have raised claims for rescission based on frustration of purpose, mutual mistake and material breach of contract. The only rescission counterclaims pleaded by the defendants are based on fraud and material misrepresentations. The defendants have raised these new claims in response to the plaintiffs' alleged interposition of contract-type claims. Having already determined that there is a basis in the pleadings for the plaintiffs' claim of a joint venture agreement and a promise to pledge collateral, once again the defendants' argument fails. The defendants have appropriately alleged a counterclaim for rescission on the basis of fraud. They may not now assert new claims that have not been adequately plead-

**25.** Even if the statute of frauds could be properly raised, it would not raise a defense to either the promise to pledge collateral or the joint venture agreement. The defendants have conceded that "the Statute of Frauds would not be a bar to an original promise by Video Shack to [pledge its] assets as collateral for a new 'combined entities' line of credit,' under which Video Shack obviously would have received a benefit." (Defendants' Memo. in Opp. to Plaintiffs' Motion In Limine at 15). The plaintiffs' complaint alleges that Video Shack promised to pledge its assets for the benefit of the combined entities. Therefore, by the defendants' own admission, the statute of frauds does not offer the defendants a viable defense.

The statute of frauds also would not pose a defense to the plaintiffs' allegations of a joint venture agreement. Because the oral joint venture agreement was not for a specified duration, it constituted a contract that, by its terms, could be performed within one year. As such, it falls outside the scope of the statute of frauds. *See Majestic Farms Supply Ltd. v. Service Riding Apparel, Ltd.*, 137 A.D.2d 501, 524 N.Y.S.2d 245, 245 (2d Dept.1988); *Balstad v. Solem Mach. Co.*, 26 Ill.App.2d 419, 168 N.E.2d 732, 734 (1960).

ed[26] or subject to discovery. Defendants are limited in their rescission remedy to the pleaded ground of fraud. Accordingly, the plaintiffs' motion to preclude the defendants' rescission counterclaims is granted. The plaintiffs' request for Rule 11 sanctions is denied.

## VIII. CONCLUSION

For all of the foregoing reasons:

1. The defendants' motion for summary judgment is granted on Counts I and XI of the Consolidated Amended Complaint, granted against Electratainment on the RICO counts, granted on the plaintiffs' claim for lost profits on the breach of contract claim and granted on the plaintiffs' claim for lost profits on the federal securities claims. It is denied in all other respects.

2. Counterdefendant Lee Gimbel's motion for summary judgment is granted except for the claim of failure to disclose alleged self-dealing.

3. Plaintiffs' and additional defendants on the counterclaims' motion to dismiss counterclaimants' damage claim "R" is granted with the limitation described in that section.

4. Plaintiffs' and additional defendants on the counterclaims' motion for a separate trial of the wiretap counterclaims is granted in its entirety.

5. Defendants' motion *in limine* is granted with respect to exclusion of the alleged tax scheme with the limitation described in that section, and denied in all other respects.

6. Plaintiffs' motion *in limine* is denied with respect to the defendants' claim for shipment of unpaid product and the plaintiffs' claim for Rule 11 sanctions, and granted in all other respects.

SO ORDERED.

---

**26.** Under Fed.R.Civ.P. 9(b), any allegation of mistake must be pleaded with particularity. The defendants' broad allegations of mutual mistake, even if appropriately raised, would be dismissed for failure to plead with specificity.